David W. **LEIDY** and Kathleen E. Leidy, individually and as Co–Personal Representatives of the Estate of Roxanne Leidy and Guardians of the Estate of Amanda Leidy

v.

**BOROUGH OF GLENOLDEN,** Police Chief Edward Cooke, individually and in his official capacity, Police Officer Matthew Illich, individually and in his official capacity, County of Delaware, Police Dispatcher Raquel Lewandowski, individually and in her official capacity, Delaware County Board of Prison Inspectors, Wackenhut Corrections Corporation

No.  CIV.A.  01–4361.

United States District Court,
E.D. Pennsylvania.

Aug. 13, 2003.

---

Jerome Brown, Philadelphia, PA, Philip A. Yampolsky, Cynwyd, PA, for Plaintiffs.

Christopher R. Mattox, Diorio & Sereni, LLP, Media, PA, Sean P. McDonough, Dougherty, Leventhal & Price, LLP, Moosic, PA, for Defendants.

### *MEMORANDUM*

DALZELL, District Judge.

Gerald Bennett entered the Glenolden Borough Police Station to surrender on a bench warrant issued for failing to attend the sex offender treatment class mandated as a condition of his parole for indecent assault. But the police, instead of arresting Bennett, let him leave.

Six days later, Bennett murdered with the strap of her bra Roxanne Leidy, the woman in whose home he was a boarder. He also raped her thirteen year old daughter, Amanda Leidy.

Plaintiffs are David and Kathleen Leidy, the representatives of the Estate of Roxanne Leidy and the guardians of Amanda Leidy. They bring this action against the police officers and other state authorities whom they deem responsible for frustrating Bennett's surrender and enabling him to commit these horrific crimes.[1] Plain-

---

1. Plaintiffs invoke our federal question jurisdiction, as their civil rights claim is grounded on 42 U.S.C. § 1983. Defendants are the Borough of Glenolden, Chief of Police Ed-

tiffs allege that defendants deprived them of life and liberty under the Due Process Clause of the Fourteenth Amendment. This claim requires us to consider the doctrine of state-created danger and, as such, the interplay of private parties and state actors.

Before us are defendants' motions for summary judgment.

## I. Standard of Review

Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the Court must view the evidence, and make all reasonable inferences from the evidence, in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of proving that there is no genuine issue of material fact in dispute. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party carries its burden, the nonmoving party must "come forward with 'specific facts showing there is a genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). The task for the Court is to inquire "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. 2505; *Tabas v. Tabas,* 47 F.3d 1280, 1287 (3d Cir. *en banc* 1995).

Because defendants move for summary judgment, we set forth the facts in the light most favorable to plaintiffs. *Clover-*

*land–Green Spring Dairies, Inc. v. Penn. Milk Marketing Board,* 298 F.3d 201, 205 (3d Cir.2002).

## II. Factual Background

### A. The Police Station

At 5:42 p.m. on August 26, 1999, it is undisputed that Gerald Bennett entered the Glenolden Borough Police Station to surrender on a bench warrant a judge had issued for his arrest. Bennett entered the station with a man and two children. Bennett carried a duffle bag, apparently containing a change of clothes. Soon after they escorted Bennett into the station, the man and children who accompanied Bennett left.

Police officer Matthew Illich was doing routine paper work when he noticed Bennett. Illich asked Bennett if he could help him and Bennett said that he was turning himself in. When Illich asked Bennett what he was turning himself in for, Bennett responded that his probation officer told him to surrender, but he would not state the reason. Illich Dep. at 14–18, 21, 25; Cooke Dep. at 79.

Although Glenolden is a small community, Illich did not recognize Bennett. Illich sat Bennett down at a desk and took from him the personal information necessary to check for a warrant, *i.e.,* name, date of birth, and social security number. Bennett also furnished a photographic identification at Illich's request. Illich Dep. at 14–18, 21, 83.

Equipped with the announced fugitive's personal information, Illich telephoned the 911 dispatcher at the Delaware County Communications Center (known for purposes of this litigation as "Delcom") to

ward Cooke, Police Officer Matthew Illich, Delaware County Communications Center dispatcher Raquel Lewandowski, the County of Delaware, the Delaware County Board of

Prison Inspectors, Wackenhut Corrections Corporation, and an employee of Wackenhut Corrections Corporation, Michelle Shannon.

check whether a warrant was reported for Gerald Bennett. The dispatcher replied that one was. She noted that Gerald Bennett was wanted for violation of probation and a bench warrant for his arrest was recorded in NCIC, CLEAN, and the County Bench Book.[2] Transcript of radio call (Aug. 26, 1999) (in Pls.' Mot. Summ. J. at Ex. 7) (hereinafter "Aug. 26 Radio Call").

Illich did not ask the dispatcher to fax the printout of the NCIC and CLEAN "hit" on Gerald Bennett. The NCIC or CLEAN hit, it is undisputed, not only corroborated that there was a warrant for Bennett but also stated the county of issue, Delaware County, and the offense on which Bennett violated probation—indecent assault. Lewandowski Dep. at 31; Cooke Dep. at 62.

Though Illich did not request a fax, there is a dispute as to whether a fax of the NCIC hit was sent to him. Illich denies having received it, and Police Chief Edward Cooke, who was also in the station that evening, has no specific recollection of seeing the fax. But Raquel Lewandowski, an experienced Delcom dispatcher and the dispatcher that evening, attests that it is her standard practice to fax the NCIC and CLEAN printout to the officer whether or not the officer requests it. Police Chief Edward Cooke confirms that experienced Delcom dispatchers do fax a printout of the NCIC or CLEAN hit regardless of whether the officer requests it. Illich Dep. at 74–76; Lewandowski Dep. at 59–60, 72; Cooke Dep. at 87, 88, 135. In view of this dispute of fact, we must assume on summary judgment that Officer Illich received the NCIC and CLEAN fax from dispatcher Lewandowski.

After informing Illich that a bench warrant was published in NCIC, CLEAN, and the County Bench Book, police dispatcher Lewandowski told Illich that she would obtain confirmation of the warrant and call Illich back. Aug. 26 Radio Call.

As it turns out, there is a distinction between checking and confirming a warrant. An officer "checks" whether one is subject to a warrant by running an inquiry on NCIC and CLEAN. If NCIC and CLEAN reveal that the person is subject to a warrant, the warrant has "checked out", and the person is placed in custody. The officer then must "confirm" the warrant. The officer confirms the warrant by obtaining a "hard copy" of the warrant, or the warrant itself. A facsimile of the warrant will also do. The officer furnishes the warrant to the constable who delivers the person to the Delaware County Prison ("the Prison"). Without the warrant, the Prison will not accept the fugitive. These policies for checking and confirming a warrant are further described *infra* Part II.C.

The Delaware County warrants were stored in the Delaware County Prison. Consequently, to confirm the warrant, the Delcom dispatcher had to call the Prison to ask that the intake clerk retrieve the warrant and fax it to Officer Illich at the Glenolden Police Department. Since Illich expected that the warrant would arrive in

---

**2.** NCIC (National Crime Information Center) and CLEAN (Criminal Law Enforcement Assistant Network) are computer databases that law enforcement officers commonly use. NCIC reports wanted and missing persons nationwide and CLEAN is specific to the Commonwealth of Pennsylvania. The fields in both databases are the same, and for wanted persons, include name, date of birth, social security number, race, place of issue, date of issue, and the reason for the warrant. Since the warrant for Gerald Bennett was issued by a subdivision of the Commonwealth of Pennsylvania, the warrant appeared in both NCIC and CLEAN. Lewandowski Dep. at 27–32, 41; Hill Dep. at 17. The County Bench Book is an updated binder kept in Delcom that lists all fugitives wanted on Delaware County warrants. Lewandowski Dep. at 38, 66.

his fax machine momentarily, he called Constable Gerald Bosch to "get him started" with picking up Bennett and delivering him to the Prison. Illich Dep. at 18.

Several minutes after they last spoke, the Delcom dispatcher telephoned Illich to inform him that the Prison did not have a warrant on Bennett. The transcript of that conversation evidences Illich's surprise, and even incredulity, that a warrant could not be found:

> [Dispatcher:] Um, the prison doesn't have anything on him. Mr. Gerald Bennett.
>
> [Illich:] Well that's funny, I just got a confirmation from CLEAN, there were squaring that away, County Bench and NCIC. [sic]
>
> [Dispatcher:] Yeah, but there's no hard copy....

Aug. 26 Radio Call at 3.

Illich admitted that it is "unusual" for a warrant to come up on NCIC, CLEAN, and the Bench Book, but for the Prison not to have a copy of it. Indeed, Illich had never before experienced this discrepancy. Illich Dep. at 68–79. His suspicion that something was amiss was confirmed by the suspect's behavior. Bennett was "insistent" that he was wanted for violation of probation. "Bennett ... appeared convinced that there should be a warrant for himself." Illich Dep. at 18, 56–57. But in tension with his certitude about his surrender, Bennett was vague and evasive about his crimes and the nature of his probation violation. Illich Dep. at 17, 19, 28–30, 56; See, e.g., id. at 30. ("He said, 'Ah, I just got myself in a little trouble.' That was the extent of what I was able to elicit out of him."); id. at 19 ("I couldn't get anything out of him as far as what he said to his probation officer. He would not elaborate on what he had been on probation for."). Bennett's surrender, coupled with his evasiveness about his criminal offense,

led Illich to conclude that he was a "wanted person." Illich Dep. at 28, 30–31.

Illich telephoned Constable Bosch to tell him that the warrant could not be found and that he did not need to pick up Bennett. Illich also asked the constable to check among the constable warrants, or the warrants maintained by a constable and issued by a district justice. Illich apparently told Bennett about the difficulties confirming the warrant, and Bennett's demeanor changed noticeably. He became "antsy" and mused aloud, "maybe I'll just go." Illich Dep. at 19–22, 69–70.

Illich consulted Police Chief Cooke, who was at the back of the station, about the Bennett problem. Police Chief Cooke had been in his office, but had seen Gerald Bennett arrive and had recognized the man who escorted him to the station as the assistant manager at the local Blockbuster. Cooke Dep. at 76, 30.

Cooke spoke with Bennett briefly and then decided to release him because the police were "unable to confirm the existence of a warrant." Cooke Dep. at 77, 78, 86. Cooke advised Bennett, "Why don't you just go out there tomorrow and turn yourself into the probation officer?" Bennett appeared "receptive to the suggestion." Cooke Dep. at 77–78. Illich ushered Bennett to the door. At 6:28 P.M., less than an hour after he came to surrender, Bennett left the police station.

Despite the troubling circumstances of their release of Bennett, the police officers never bothered to get Bennett's address. An address, in fact, was required on the incident report, a standard police form. Illich Dep. at 35–36; Cooke Dep. at 68–72, 80–81. The officers also did not bother to record the name of Bennett's probation officer, although Bennett had given it to them. Cooke Dep. at 77.

It is undisputed that minutes after Bennett went on his way, Illich received a

phone call from Constable Bosch. The constable reported that the Prison found the warrant. The Delcom dispatcher called with the same disquieting news.

On hearing this, Illich sped off in his patrol car to find Bennett. Cooke headed home. Cooke Dep. at 118. Illich checked the bus stops and pay phones within walking distance of the police station in a search that lasted, he said, fifteen to twenty minutes. Illich at 22–24.

Aside from Officer Illich's perfunctory search, no one made any effort to find Bennett. Illich 24; Cooke Dep. 117–122. Police Chief Cooke did not contact the assistant manager at Blockbuster who had brought Bennett to the police station. Nor did the officers call the Delaware County Office of Adult Probation to check whether Bennett reported there.

### B. Telephone Call to the Prison

As can be gathered, when police dispatcher Raquel Lewandowski called the Prison to confirm the warrant, she was given an inaccurate report that the warrant could not be found. It is possible to discover from the record how the effort to find the warrant went awry.

The conversation between police dispatcher Lewandowski and Prison booking specialist Michelle Shannon, in which she missed the warrant on Bennett, was brief. We reproduce it in full.

Hello

Hello, this is Radio Room

Hi

Can you check for um, Bennett, last name is B–E–N–N–E–T–T

Okay

Gerald

Birth date?

His birth date is 8/20/69

All right, hold on

Thanks

Ah, huh

Um, we don't have one

Nothing?

No, I didn't see anything.

All right, I'll tell Glenolden to let him go then.

All right

Thanks

You're welcome

Bye, bye

Aug. 26 Radio Call; Shannon Dep. at 38.

Michelle Shannon testified that she thought that she heard "Joe Bennett." Shannon Dep. at 27. Further, as the transcript of the telephone call reflects, neither party made any effort to ensure that the correct name and spelling of the suspect was transmitted, such as to repeat back and spell the suspect's name. Shannon simply entered the last name "Bennett" in the county computer (in which the warrants kept at the Prison are logged), and when she saw that no fugitive appeared on her computer screen with the full name "Joe Bennett" declared that the Prison did not have a warrant. Aug. 26 Radio call; Shannon Dep. at 27–32; Pelleriti Dep. at 23.

Constable Bosch, after Illich told him that the warrant could not be found, called the Prison himself and spoke to correctional officer Michael Pelleriti, who immediately found the warrant. Bosch Dep. at 12, 17–18; Pelleriti Dep. at 23.

### C. Police Department and Delaware County Handling of Warrants

Delaware County and the Glenolden Police Department maintain a policy for "checking" and "confirming" warrants. Though not written down, the policy is authoritative at the county and municipal levels. To be sure, the policy has been articulated in the context of street arrests as opposed to voluntary surrenders. There is, however, little doubt that this practice is what Police Chief Cooke and

Police Officer Illich had in mind on the evening that Gerald Bennett tried to surrender.

When an officer wants to check whether one is subject to a warrant, he or she radios to the dispatcher at Delcom and requests an NCIC and CLEAN inquiry. If NCIC and CLEAN report an open warrant, the officer places the person in custody and drives him to a police station. Cooke Dep. at 60. The officer then must confirm the warrant. Confirming a warrant is done because:

An NCIC printout is not a legal document and has no—it's not from the Court. It's just a tool that's available to police. And it's up to the police officer, once he's armed with that NCIC hit, to confirm the validity of the warrant or the existence of a warrant.

Cooke Dep. at 62.

Though reliable, NCIC and CLEAN are not foolproof. Because of human error, or because a warrant has been rescinded and NCIC and CLEAN have not been updated, or because a person shares the same name or personal information as a wanted suspect, NCIC or CLEAN may report that someone is subject to a warrant who is not. Cooke Dep. at 64–68; Lewandowski Dep. at 63–66, 75. Confirming a warrant thus protects people's liberty against unnecessary and unlawful intrusion. Confirming a warrant is also done for another reason. The Prison, where those wanted on County warrants are detained, will not accept an inmate unless the constable delivering him has the warrant in hand. Cooke Dep. at 111; Lewandowski Dep. at 39–41,; Bosch Dep. at 27–28; Pelleriti Dep. at 43.

Confirming a warrant is simply a way of verifying that a warrant is active and valid. The warrant is obtained from the jurisdiction that issued it. Since Delaware County issued the warrant for Bennett, and County warrants were kept in the Prison, the dispatcher had to call the Prison and request that the Prison fax Illich a copy. Once Illich received the faxed warrant, Constable Bosch could then come and bring Bennett to the Prison. Cooke Dep. at 62–63, 111.

This litigation has exposed several possible flaws in the system of checking and confirming warrants.

There is no policy to reconcile a discrepancy about the existence of a warrant. In other words, if one source of information says there is a warrant and another source of information says there is not, there is no requirement that the officer figure out which information is right or seek guidance on how to do so. Here, where four sources of information said that Bennett was subject to a warrant (Gerald Bennett himself, NCIC, CLEAN, and the Bench Book) and one source of information suggested he was not subject to a warrant (the Prison), Illich, an inexperienced police officer, was left to his own devices. Illich Dep. at 72; Cooke Dep. at 159–61; Lewandowski Dep. at 64. The absence of any guidance to officers on how to reconcile a discrepancy about the status of a warrant is all the more glaring given that warrants are confirmed several times a day and the Prison has failed to confirm valid warrants in the past. Lewandowski Dep. at 69–70; ltr. of Police Chief Edward Cooke to Warden Irwin Goldberg (9/2/99) (in Pls.' Mot. Summ. J. at Ex. 3); Cooke Dep. at 147–48, 158–59.

Similarly, there are two situations in which a warrant is not confirmed which have very different consequences, although Delaware County treats them alike. The first is where the officer disconfirms the warrant.[3] The second is where the officer

---

3. You'll have the agency tell you that that warrant has been taken care of and rescinded and we forgot to take it out of NCIC.

Cooke Dep. at 64.

neither confirms nor disconfirms the warrant.[4] In both instances, the suspect is released.[5] The officer need not even inquire into what the suspect is wanted for before releasing him in this manner. Cooke Dep. at 135–40.

Nor do there appear to be even minimal measures that an officer must follow before deciding to release a suspect on the ground a warrant cannot be confirmed. Though there is a holding cell in the police station, there is no policy that addresses whether and under what circumstances a suspect should be detained while the officer confirms the warrant. There is no policy directing what procedures should be followed in confirming a warrant and what information is sufficient for an officer to conclude that a warrant has been (as it were) disconfirmed. Though it is quite clear what is necessary to confirm a warrant, no policies or procedures address at what point an officer can conclude that there is indeed no warrant. Officers Illich and Cooke released Bennett shortly after hearing that the Prison could not find the warrant. Other officers attest that they would have held Bennett longer and taken other investigative steps given the circumstances here. Constable Bosch at 30; Hill Dep. at 73; Gallagher Dep. at 16–17.

Finally, there is no protocol dealing with a suspect's release when a warrant cannot be confirmed. No procedure exists, for example, that would find out whether the person is wanted for a minor offense or a serious crime. There seems to be no duty even to get the suspect's address or to confirm his identity.

Given the lack of policy guidance governing the process of confirming a warrant and the detention of the suspect while confirmation takes place, it appears that, with the exception of Officer Illich's failure to get Bennett's address in order to prepare an incident report, nothing the officers did violated departmental policy.

### D. The Prison and Warrants

The practice of storing County warrants at the Prison apparently dates back decades, and appears to derive its origins from when the Prison was the only law enforcement organization in the jurisdiction that was open twenty four hours a day and seven days a week. Hill Dep. at 18–20, 51. The warrants are maintained in the Intake Unit of the Prison.

About 1996, Delaware County contracted out operation of the Prison (called the George W. Hill Facility) to Wackenhut Correctional Facility, a for-profit prison operator. Wackenhut runs the Prison

---

4.

> The agency could tell you, small department, I can't get a hold of the detective, he's not around, I believe there might be a warrant in his office, and I can't get my hands on it.
> Cooke Dep. at 64.

5.

> Q: So if I understand what you're saying, in Example No. 1, the agency says that the hit is not valid because the warrant previously existed but has since been rescinded?
> A: Yes.

> Q: So as opposed to obtaining confirmation that a warrant exists, in that instance, you're getting confirmation that the warrant does not exist?
> A: Yes.
> Q: And what happens next?
> A: Then the person will be released.
> . . .
> Q: And Example No. 2 that you gave me . . . was where the issuing agency is indicating they believe there's a warrant, but they can't place their hands on it immediately?
> A: Yes.
> Q: What's supposed to happen then?
> A: The person will be released.
> Cooke Dep. at 65–67.

pursuant to a contract ("Contract") with the Delaware County Board of Prison Inspectors. The Delaware County Board of Prison Inspectors, together with Delaware County's Office of Superintendents, monitor Wackenhut's compliance with the Contract. Sexton Dep. at 12–16, 28; Hill Dep. at 8–10.

The Contract contains the rules and regulations governing the day-to-day operation of the Prison. Sexton Dep. at 18. Though it provides for everything from the commissary to the laundry, it is silent on maintaining and retrieving warrants. Until this incident, in which the Prison failed to confirm the warrant on Gerald Bennett, the Delaware County of Board of Prison Inspectors and the Office of Superintendents never monitored the Prison's handling of warrants. Hill Dep. at 14, 22, 59; Sexton Dep. at 36–37.

Within months of taking over, Wackenhut made staffing changes in the Intake Unit. Wackenhut replaced trained correctional officers with entry-level employees with no law enforcement background, known as "booking specialists." Pelleriti Dep. at 10, 16–17. Michelle Shannon was one such booking specialist, and she testified that the post she assumed at the Prison was her first job since graduating high school, apart from babysitting her niece and working at the neighborhood Friendly's and Wawa. Shannon Dep. at 7.

Booking specialists were given no formal training on how to respond to inquiries about warrants. Shannon Dep. at 10–11, 17; Gallagher Dep. at 10–19; Pelleriti Dep. at 10–11. Thousands of open warrants were kept alphabetically in filing cabinets in the Intake Unit. They were also logged in the county computer. The untrained booking specialists were given no protocol or checklist to use when searching for warrants, such as (a) to read back the name and spelling of the suspect in question to the dispatcher, (b) to read to the dispatcher the names of all those listed as fugitives in the county computer with the same last name as the suspect, (c) to search for a warrant in the filing cabinet even if it does not come up in the computer, and (d) to check the fax machine for warrants that are newly arrived. Pelleriti Dep. at 39–41; Shannon Dep. at 18. Either (a) or (b) would have likely averted catastrophe here.

### E.  Gerald Bennett

We now turn to Gerald Bennett himself.

In March of 1999, Bennett was released on parole after serving 11 ½ months in prison for indecent assault and for the prior offense of simple assault. He was assigned to probation officer Mary Beth DePaulis, a specialist in the supervision of sex offenders. DePaulis Dep. at 18, 21.

When in their second meeting Bennett informed DePaulis that he again had not attended sex offender treatment class, a condition of his parole, DePaulis warned Bennett that his failure to participate in the program would result in a bench warrant being issued for his arrest. DePaulis Dep. at 21–22. When Bennett still failed to participate in the program, DePaulis sought, and obtained, a bench warrant from the Honorable Frank T. Hazel of the Delaware County Court of Common Pleas.[6] DePaulis Dep. at 21–22, 39.

After Judge Hazel issued the bench warrant, Bennett telephoned DePaulis, and acknowledged his refusal to participate in the sex offender treatment class. Bennett also revealed that he was using illegal drugs. DePaulis instructed Bennett to turn himself in. Shortly thereafter, Ben-

---

**6.**  The sex offender treatment class consisted of an initial session with a psychiatrist and therapist followed by weekly group therapy classes. DePaulis Dep. at 23–25.

nett came to the Glenolden Borough Police Station, which brings us to the events of this case. DePaulis Dep. at 29–39.

On September 1, 1999, six days after he attempted to surrender to the Glenolden Police, Bennett fatally strangled Roxanne Leidy with the strap of her bra, and raped her thirteen year old daughter, Amanda Leidy. Roxanne and Amanda Leidy lived in a Delaware County apartment building, and Bennett resided with them.

### III.  *Substantive Due Process Analysis*

■ The Due Process Clause of the Fourteenth Amendment provides: "No State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. It is well-settled that the Clause contains a substantive element that prohibits arbitrary governmental action regardless of the procedural safeguards afforded. *County of Sacramento v. Lewis*, 523 U.S. 833, 840, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); *Daniels v. Williams*, 474 U.S. 327, 331–32, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

■ Plaintiffs allege that the defendants permitted Gerald Bennett to leave, instead of arresting him, and thus created the opportunity for Bennett to commit his horrible crimes. Where, as here, someone allegedly has been deprived of life, liberty, or property at the hands of private individuals, analysis must begin with *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). *See, e.g., Schieber v. City of Philadelphia*, 320 F.3d 409, 416 (3d Cir. 2003); *Brown v. Penn. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 477 (3d Cir.2003).

Joshua DeShaney was a young boy whose father beat him over an extended period of time. The State of Wisconsin knew of the abuse that Joshua suffered at his father's hands, and even took measures to help ensure the boy's well-being. The Department of Social Services took temporary custody of him and then sent a caseworker to monitor his family. 489 U.S. at 192–93, 109 S.Ct. 998. Despite telling indications that Joshua remained in grave danger from his abusive father, the State did nothing else. *E.g. id.* at 193, 109 S.Ct. 998 ("The caseworker dutifully recorded these incidents in her files ... but she did nothing more."). Eventually, Joshua was so severely beaten by his father that he suffered brain damage and was placed in a home for the profoundly disabled. *Id.*

Joshua and his mother instituted an action against the Wisconsin Department of Social Services and its officials alleging they deprived Joshua of his right to liberty under the Due Process Clause of the Fourteenth Amendment. The Court of Appeals for the Seventh Circuit dismissed their claim, and the Supreme Court granted certiorari to decide "when, if ever, the failure of a state or local governmental entity or its agents to provide an individual with adequate protective services constitutes a violation of the individual's due process rights." *Id.* at 194, 109 S.Ct. 998. The Supreme Court resolved a circuit split in which several courts had decided, in an approach inconsistent with that of the Seventh Circuit, that once the State undertakes to rescue a child from private danger it assumes an affirmative duty to secure the child's liberty and life. *Id.*

The Supreme Court recalled the text and legislative history of the Fourteenth Amendment and observed that the Fourteenth Amendment Due Process Clause is "phrased as a limitation on the State's power to act," not as a stricture on the behavior of private persons or a guarantee that the State provide "minimal levels of safety and security." *Id.* at 195, 109 S.Ct.

998. "Its purpose was to protect the people from the State, not to ensure that the State protected them from each other. The Framers were content to leave the extent of governmental obligation in the latter area to the democratic political processes." *Id.* at 196, 109 S.Ct. 998. In short, the Due Process Clause "forbids the State *itself* to deprive individuals of life, liberty, or property" without due process of law. *Id.* at 195, 109 S.Ct. 998 (emphasis added).

"Consistent with these principles," the Court continued, "the Due Process Clause[ ] generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property."[7] *Id.* at 196, 109

---

7. The holding of *DeShaney*, that the State itself must deprive an individual of life, liberty, or property was not a constitutional departure. *See Civil Rights Cases*, 109 U.S. 3, 11–18, 3 S.Ct. 18, 27 L.Ed. 835 (1883) (deciding that the Fourteenth Amendment guarantees individual liberty against governmental and not private invasion).

Where *DeShaney* is significant is in its elaboration of the relationship between state action and the deprivation of life, liberty, or property under the Fourteenth Amendment. Before *DeShaney* it could have been argued that the State deprives one of life, liberty, or property by failing to furnish the citizen with the means to enjoy those rights. In that vein it could have been argued that by failing to supply food and shelter to the needy, or failing to provide effective police protection, the State deprives people of life, liberty or property.

*DeShaney* forecloses that understanding. *E.g. id.* at 196, 109 S.Ct. 998 ("[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."). Based on its reading of the text—"the Clause is phrased as a limitation on the State's power to act"—and its understanding of the intent of the Framers—"the Due Process Clause of the Fourteenth Amendment was intended to prevent government from abusing its power or employing it as an instrument of oppression"—the Supreme Court held that the Due Process Clause generally does not oblige the State to protect individuals from private danger. *Id.* at 195–96, 109 S.Ct. 998 (quotations and alterations omitted). The decision of *DeShaney* rests on a "negative" notion of liberty or the idea that rights serve to curtail government authority, a view Judge Posner has expressed as follows:

> [T]he Constitution is a charter of negative rather than positive liberties. The men who wrote the Bill of Rights were not concerned that government might do too little for the people but that it might do too much to them. The Fourteenth Amendment, adopted in 1868 at the height of laissez-faire thinking, sought to protect Americans from oppression by state government, not to secure them basic governmental services.... [A contrary view] would turn the clause on its head. It would change it from a protection against coercion by state government to a command that the state use its taxing power to coerce some of its citizens to provide services to others.

*Jackson v. City of Joliet*, 715 F.2d 1200, 1203–04 (7th Cir.1983).

For a critique of the view that the Due Process Clause operates as a restraint on government authority, but not as a guarantee that the government preserve individual life, liberty, and property against private invasion, see Steven J. Heyman, *The First Duty of Government: Protection, Liberty and the Fourteenth Amendment*, 1991 Duke L.J. 507 (Dec.1991) (opining that the Fourteenth Amendment required the states to protect the fundamental rights of all persons, and that those fundamental rights are inalienable, natural law rights, including the right to protection against private violence); Robin West, *The Constitution and the Obligations of Government to Secure Material Preconditions For a Good Society: Rights, Capabilities, and the Good Society*, 69 Fordham L.Rev.1901, 1906–12 (2001) (observing that just because constitutional rights obtain against the State does not mean that they do not extend to state action as well as state inaction); Susan Bandes, *The Negative Constitution: A Critique*, 88 Mich. L.Rev. 2271, 2308–2327, 2346–47 (suggesting that in the modern social welfare state, the failure of the State to protect against private violence is the deprivation of life, liberty or property).

We do not take sides in this debate, and under *DeShaney*, we cannot.

S.Ct. 998. "If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them." *Id.* at 196–97, 109 S.Ct. 998. Holding that "as a general matter...a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause," the Court denied Joshua De-Shaney's claim as asserting only a failure to protect. *Id.* at 197, 201, 109 S.Ct. 998.

■ *DeShaney* does not necessarily and in all instances foreclose holding the State responsible for violence that private citizens inflict. Its holding that the State itself must cause the deprivation of life, liberty, or property in question does not, as a logical matter, preclude holding the State responsible where state action so enabled or encouraged private violence that the State can fairly be said to have caused it. As Judge Posner has trenchantly put it, "If the state puts a man in a position of danger from private persons and then fails to protect him...it is as much...as if it had thrown him into a snake pit." *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir.1982). Realizing this, our Court of Appeals in 1996 announced a state-created danger doctrine which imposes liability under the Due Process Clause where the State has acted to create or increase a risk of harm that culminates in loss of life, liberty or property at the hands of private actors. *See Kneipp v. Tedder*, 95 F.3d 1199, 1201 (3d Cir.1996). This state-created danger doctrine consists of four elements [8]. "Determining the appropriate lens through which we must view actions in the state-created danger context, though, is a vexing problem." *Brown*, 318 F.3d at 479.

We will begin by discussing the fourth element of *Kneipp* because it captures the state action requirement as *DeShaney* elucidates it. It also provides our fundamental reason for rejecting plaintiffs' claim.

### A. Did state actors use their authority to create an opportunity for harm that would not otherwise have existed?

As we noted, the Fourteenth Amendment Due Process Clause does not require the State to provide protective services. If it does not require the State to provide protective services at all, it follows that it does not require it to provide *adequate* protective services. *See Brown*, 318 F.3d at 478; *DeShaney*, 489 U.S. at 202–03, 109 S.Ct. 998. Because plaintiffs at bottom complain about the adequacy of protective services, as a matter of law we must deny their § 1983 claim.

■ To be sure, plaintiffs' argument has appeal. They contend that Police Officer Illich and Police Chief Cooke, by putting Bennett back on the street when, as a surrendering fugitive, he had come to turn

---

[8]. The Court of Appeals recapitulated the four *Kneipp* factors as: "(1) The harm ultimately caused was foreseeable and fairly direct; (2) the state actors acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the State and the plaintiff; and (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the private party to cause harm." *Brown*, 318 F.3d at 479 (citing *Kneipp*, 95 F.3d at 1208).

It bears mentioning that the *Brown* panel scrutinized the case twice, once after argument on April 18, 2002 and again upon panel rehearing submitted on September 12, 2002. *See id.* at 473. Shortly after the panel vacated its decision, we placed this case in civil suspense pending final appellate action in *Brown*. *See Leidy v. Borough of Glenolden*, C.A. No. 01–4631, docket no. 43 (E.D.Pa. Oct. 1, 2003). We restored this case to active status the day after the panel released its January 22, 2003 iteration.

himself in, created an opportunity for Bennett to attack Roxanne and Amanda Leidy that would not have otherwise existed. Compelling as it is, we must reject this contention.

Plaintiffs assume that the reference point for analyzing *Kneipp* element four is the moment when Bennett walked into the police station. We disagree. Under the Fourteenth Amendment, defendants were under no duty to obtain the warrant in the first place. Indeed, it does not follow as invariable supervision practice that a failure to comply with a term of probation or parole inevitably leads to an arrest warrant. Had *no* warrant ever issued, Bennett would still have committed his offenses.

*DeShaney* instructs us that the failure to protect against private harm is not a deprivation of life or liberty under the Fourteenth Amendment. To violate the Fourteenth Amendment, the State itself must deprive an individual of life, liberty, or property, and after *DeShaney* its failure to protect an individual from private harm, alone, is no longer a viable theory. We must thus assess whether plaintiffs assert a failure to protect them from Bennett and something more.

At first glance, when state actors put back on the street a fugitive who was surrendering on an open warrant, it appears that they actually created the opportunity for a crime to occur under element four.[9] But when we recall the entire context—that Bennett was a sex offender before these state actors became involved and that the State put him in prison, released him on parole, and issued a bench warrant for his arrest, but failed to accept his voluntary surrender—it becomes clear that the wrongs of which plaintiffs complain is that the State did not do enough to protect them from Bennett. "[A] constitutional duty to protect an individual against private violence may exist ... if the state has taken affirmative action which increases the individual's danger of, or vulnerability to, such violence beyond the level it would have been at absent state action." *Freeman v. Ferguson,* 911 F.2d 52, 55 (8th Cir.1990).[10] In the absence of *any* state action, Bennett still would have committed these offenses, or, to put it another way, there is no evidence to conclude that he would not have. State action neither made Bennett more violent nor made Roxanne Leidy and Amanda Leidy more vulnerable to Bennett.[11]

**9.** A jury could readily find that had the defendants arrested him, Bennett would not have had the opportunity to commit these offenses. The testimony of probation officer DePaulis discloses that once Bennett was held on the bench warrant the initial hearing on the probation violation would not have taken place for at least two weeks and Bennett would have been kept in custody until then. At the hearing, the probation officer can recommend to the judge (to whom it is her job to report) a range of dispositions. DePaulis stated that she would likely have recommended to Judge Hazel that Bennett have his parole revoked, or, at the very least, that Bennett undergo a psychiatric evaluation before a disposition be made. DePaulis Dep. at 31–32, 42–43, 55, 57–58.

**10.** *Accord Schieber,* 320 F.3d at 416 ("[A] constitutional violation may occur when the state acts in a way that makes a person substantially more vulnerable to injury from another source than he or she would have been in the absence of the state intervention."); *DeShaney,* 489 U.S. at 201, 109 S.Ct. 998 ("That the State once took custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been in had it not acted at all ....").

**11.** Admittedly, *Kneipp* element four can be read as satisfied here if we assess state action only from the moment that Bennett walked in the door of the police station forward. But this is in part because element four is so elastic. It could, for example, cover anyone on supervision who commits a new offense. Even the state action complained of in *DeSha-*

Illich and Cooke may have taken Bennett into custody. But when they released him he posed no more of a danger than he did before he came into the station. *DeShaney*, 489 U.S. at 201, 109 S.Ct. 998 ("That the State once took custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been in had it not acted at all . . . .").

Other cases reinforce our analysis. In some cases where law enforcement officers were held responsible for a state-created danger, the officers acted to instigate private violence.[12] In others, the officers acted to place people in harm's way who would otherwise not have been at risk.[13] In others, the conduct of officers investigating crimes set off other hazards.[14] In a final set of cases, the officers intervened in such a way as to cut people off from their private sources of protection.[15]

In contrast, where police officers took insufficient measures to avert or control private violence, courts have not deemed the loss of life or liberty to be the result of state action.[16]

By foiling Bennett's surrender, the defendants gave inadequate protective service to the community. But inadequate protective services, like the failure to provide protective services at all, constitute only a failure to protect, and without more we must (reluctantly) deny plaintiffs' claim.

Although we have found that plaintiffs' claim fails element four of *Kneipp* because

---

*ney* can be seen as satisfying it. We have thus construed element four in a manner that harmonizes it with *DeShaney*, as *Brown* was at such pains to do. By failing to execute a warrant issued by the court, defendants placed plaintiffs in no greater danger than had the state actors not acted at all.

**12.** *Butera v. District of Columbia*, 235 F.3d 637, 641–44 (D.C.Cir.2001) (recruiting drug user to serve as undercover buyer in murder investigation); *Monfils v. Taylor*, 165 F.3d 511, 513–15 (7th Cir.1998) (disseminating tape of telephone call by anonymous informant as to criminal about whom he informed); *Roberson v. City of Philadelphia*, No. 99–3574, 2001 WL 210294, at *12 (E.D.Pa. Mar. 2, 2001) (telling one feuding family that the rival family went to police to file complaint).

**13.** *Cornelius v. Town of Highland Lake*, 880 F.2d 348, 351 (11th Cir.1989) (dispatching "community work squad" of inmates to vicinity of town hall); *Wood v. Ostrander*, 879 F.2d 583, 586 (9th Cir.1989) (arresting driver and impounding car forcing passenger to walk home alone on high-crime highway).

**14.** *Estate of Smith v. Marasco*, 318 F.3d 497, 502–07 (3d Cir.2003) (deploying officers replete with riot gear and "flash bang distraction devices" causing suspect to suffer cardiac

arrest); *Reed v. Gardner*, 986 F.2d 1122, 1127 (7th Cir.1993) (arresting designated driver).

**15.** *Kneipp*, 95 F.3d at 1211 (separating intoxicated pedestrian from escort); *Schieber*, 320 F.3d at 414–415, 427–28 (discouraging neighbors from attempting rescue).

We note that *Schieber* was dismissed on other grounds. 320 F.3d at 117–23 (holding that conduct of police officers did not shock the conscience). The entire Court of Appeals panel and the District Court, nevertheless, subscribed to the view that separating one from her private source of protection can constitute the deprivation of life or liberty under the Fourteenth Amendment. 320 F.3d at 414–15, 423–25, 427–28.

**16.** *Brown v. Grabowski*, 922 F.2d 1097 (3d Cir.1990) (failing to institute criminal charges or advise victim to get restraining order); *Commonwealth Bank & Trust Company v. Russell*, 825 F.2d 12 (3d Cir.1987) (escaped prison inmate); *Roberson*, 2001 WL 210294, *1, 12 (failure to execute arrest warrant); *Henderson v. City of Philadelphia*, No. 98–3861, 1999 WL 482305, *aff'd without opinion* at 216 F.3d 1076 (3d Cir.2000) (young man jumping out window at sight of state officials arriving to bring him to asylum); *Estate of Burke v. Mahoney City*, 40 F.Supp.2d 274 (E.D.Pa.1999) (refusing to defuse a fracas at party).

the defendants did not act to create or increase the danger that Gerald Bennett posed, we will in the interest of completeness briefly consider the other three *Kneipp* elements.

### B. Was the harm ultimately caused foreseeable and fairly direct?

The defendants do not contest that Bennett's crimes were the fairly direct result of his abortive surrender. We therefore turn to whether the crimes that Bennett committed were foreseeable to the individual defendants.

### 1. Officer Illich and Chief Cooke

Just as it is foreseeable that a drug user who fails to participate in drug treatment will relapse on drugs, it is foreseeable that a sex offender who fails to participate in sex offender treatment may well be more likely to commit a sex offense. While it may be true that Illich and Cooke did not know that Bennett's refusal to participate in sex offender treatment led to the warrant, there were enough other indications that Bennett was a sexual offender whose sexually-laden crimes were foreseeable to them.

Both officers had reason to believe Bennett was a criminal subject to an open warrant. Bennett came to the station carrying a duffle bag and announcing his surrender. The check of NCIC, CLEAN, and the County Bench Book that the officers made—based upon the information Bennett himself gave them—corroborated that he was indeed wanted on an open warrant. Furthermore, Bennett's demeanor—his insistence there was a warrant and his reticence to discuss his criminal offense—bolstered the officers' belief that Bennett was a criminal. Illich Dep. at 17, 19, 28–30, 56; Cooke Dep. at 68–69, 127; *see also* Cooke Dep. at 76. In fact, the only evidence that Bennett was not wanted was the Prison's report that the warrant could not be found, a report that

was at a minimum surprising, and one that the officers did not bother to verify or explain.

The reason for the warrant was not a mystery. The NCIC and CLEAN search that Lewandowski performed at Illich's request revealed that Bennett violated his "probation" for indecent assault. Although Illich did not request the NCIC and CLEAN report, dispatcher Lewandowski testified that she faxed the NCIC and CLEAN report to him, and on summary judgment we must infer that she did. Even if Illich did not get the NCIC and CLEAN report from Lewandowski, the standard police protocol is that he should have requested it.

Lastly, Gerald Bennett's rap sheet was available to Illich based upon the personal information that the surrendering fugitive supplied him. The rap sheet featured convictions of indecent assault, simple assault, robbery, and firearm offenses.

We conclude that the information that (a) Bennett was wanted for violation of parole (or, as the NCIC reported, "probation") for a conviction of indecent assault, (b) Bennett's criminal history, and (c) his evasiveness about his criminal offense, made it foreseeable that Bennett would commit a violent sex offense. At a minimum, we hold that a reasonable jury could so find.

### 2. Dispatcher Lewandowski

Whether the Delcom dispatcher could have foreseen Bennett's offenses is also a matter appropriate for a jury. On the one hand, Lewandowski had at her disposal law enforcement databases that contained Bennett's warrant status and criminal history. On the other hand, she did not have the opportunity to observe Bennett's demeanor and it appears that the patrol officer—not the dispatcher—has

the responsibility for deciding what information to obtain on a suspect and making inferences about the information. While a close call, we conclude that a jury could find that Bennett's offenses were foreseeable to Lewandowski.

### 3. *Shannon*

The plaintiffs maintain that Michelle Shannon, who worked in the intake unit of the Prison as a booking specialist, and who handled the call from Lewandowski inquiring whether there was an open warrant in the Prison on Gerald Bennett, had access to information that would have forewarned her that Bennett had a propensity for committing sex crimes. They note that Shannon could have learned of Bennett's criminal history from the computer terminals in the intake unit.

Even if we overlook the fact that there is no evidence from which to find that Shannon knew how to use the computers in question, we conclude that no trier of fact could find that Shannon could have foreseen the crimes that Bennett committed. Shannon was a clerical employee with no law enforcement background. Given this, she was not in a position to understand the risk that releasing Gerald Bennett posed.

---

**17.** The standard shocks the conscience "duplicates no traditional category of common-law fault." *Id.* at 848, 118 S.Ct. 1708. Conduct that shocks the conscience in one circumstance may fail to in another. *Id.; see generally Schieber,* 320 F.3d at 417–21; *Smith,* 318 F.3d at 508–509. The Supreme Court has found that in situations calling for a rapid response and involving the pull of competing obligations, such as with a high-speed car chase or prison riot, only an intent to harm will shock the conscience. In contrast, where the circumstances allow the luxury of relaxed deliberation largely free of the pull of competing obligations, such as with a prison

### C. *Did the state actors act in willful disregard for the safety of plaintiffs?*

This prong must be modified in light of Supreme Court case law since *Kneipp.* In *County of Sacramento v. Lewis,* 523 U.S. 833, 845–55, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), the Supreme Court made clear that for state action to violate the substantive Due Process Clause it must shock the conscience. Only conduct that is truly egregious will "shock the conscience." While the standard is situation-specific, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level," whereas negligence is never enough to shock the conscience. *See id.* at 846–49, 118 S.Ct. 1708. With this standard in mind, we turn to the individual defendants.

### 1. *Police Chief Cooke*

We think that the behavior of Police Chief Cooke was not only reckless but bad enough that a reasonable jury could conclude that it shocks the conscience [17].

Police Chief Cooke released Gerald Bennett in conscious disregard for the risk that he posed to the public. Chief Cooke did not care what Gerald Bennett was on probation for. He did not care what the violation of probation was. He was not

official performing routine inmate care, deliberate indifference will shock the conscience. *Lewis,* 523 U.S. at 853–54, 118 S.Ct. 1708. The circumstances of this case more closely resemble that of a prison official performing routine care than a car chase or riot. Illich and Cooke were not pressured by time or a resistant suspect. *See, e.g.,* Cooke Dep. at 105; Illich Dep. at 14–15. Bennett's confession and the appearance of the warrant on NCIC and CLEAN gave the officers probable cause to detain. We thus find deliberate indifference to have been enough to shock the conscience here.

even concerned whether Gerald Bennett was a sexual predator or a senior member of Al Qaeda. The record can be read to support the disturbing conclusion that what Chief Cooke was most concerned with was showing Bennett the door when learning that the Prison did not have the warrant.[18]

This is not the first time that the Prison failed to confirm a warrant. Cooke knew that the Prison failed to confirm valid warrants in the past. Cooke Dep. at 147–148, 158–59; Letter of Edward Cooke to Irwin Goldberg (Sept. 2, 1999). Nevertheless, Cooke released Bennett without making any effort to determine whether there was a warrant, in the face of obviously conflicting information.

The defendants contend that Cooke was just following County policy and, thus, had no choice but to behave in the manner he did. While the record may be susceptible to this reading, it is equally susceptible to the conclusion that County policy was not in the final analysis responsible for the release of Bennett. For example, while the well-settled policy and practice was for the warrant to be confirmed before the suspected fugitive would be delivered to the Prison, there was no policy directing how to confirm a warrant or dictating at what point a warrant could not be confirmed. Rather, the policy seemed to leave those questions to common sense, a commodity that was conspicuously absent here. Chief Cooke bureaucratically threw up his hands and concluded that he could not confirm the warrant based upon the lone word of the Delcom dispatcher even though the confessed suspect was detained (if at all) for only a few minutes. Nor was there a policy obliging the officer to ignore the suspect's criminal history and the magnitude of his parole violation or to release the suspect without taking enough infor-

---

18. The following excerpts illustrate Police Chief Cooke's deliberate disregard for the risk that Gerald Bennett posed to the public:

Q: Did you care one way or the other whether he was on probation for a violent crime or a non-violent crime?
A: That wasn't the issue that night.
Q: So the answer was no, you didn't care one way or the other whether it was a violent or a nonviolent crime?
A: I never—I didn't give it any thought.
Q: Did you give any thought to whether or not Mr. Bennett was a dangerous individual?
A: No.
Q: Did you make any effort to investigate whether or not Mr. Bennett had a prior history of being a dangerous individual?
A: I did not personally, no.
Q: Did anyone in the Glenolden Police Department?
A: I don't know.
. . .
A: I didn't ask him if he was convicted of speeding or murder. I didn't ask him any of that.
. . .
Q: You indicated that you told Mr. Bennett to contact his probation officer. Did you care one way or the other whether he agreed that he would?
A: In the absence of the warrant, it didn't matter to me if he contacted him or not.
. . .
Q: Well, just knowing in general what you know today, which is that Mr. Bennett had some kind of a sex offense in his background, would you have acted any differently on August 26th, 1999, than the way you did act?
A: I doubt it.
Q: And if Mr. Bennett told you on the night in question, I served 11½ months for indecent assault and as a condition of my parole, I was required to attend sex offender treatment classes and I haven't so they issued a warrant for my arrest, would you have acted any differently than you acted?
A: Probably not.
Cooke Dep. at 136–44. *See generally* Expert Report of Henry T. O'Reilly at 7–8 (criticizing Police Chief Cooke for his cavalier disregard of the risk of Gerald Bennett to the community and commenting that, "Fortunately, this attitude is not shared by the rest of the law-enforcement profession.").

mation from him so that he could be arrested if the warrant were later found.

The defendants' argument that the Fourteenth Amendment required Cooke to behave as he did is equally without merit. An officer may arrest one without a warrant so long as there is probable cause. *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Atwater v. City of Lago Vista,* 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001). Cooke does not deny that there was probable cause to arrest Bennett here. *E.g.* Cooke Dep. at 102 ("NCIC hit is hard probable cause to detain."). Of course, one arrested without a warrant is entitled to a probable cause hearing within forty-eight hours. *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). But Cooke, in a tiny fraction of that time, and without exploring avenues of inquiry into whether there was a warrant, decided that Bennett should be released.

Having made no serious attempt to figure out whether there was a warrant and releasing Bennett in the face of conflicting information—including Bennett's own surrender—Cooke's decision to release Bennett could shock the conscience. Cooke "suggested" to Bennett that he turn himself into his probation officer the following morning. But he never checked whether Bennett did. He did not so much as take down Bennett's address or the name of his probation officer in the event that the Prison found the warrant. When the Prison did find the warrant minutes after Bennett left, instead of attempting to pursue Bennett (who was on foot and carrying a duffle bag), Cooke decided to go home. In the days that followed, Cooke made no effort to find Bennett. He did not call the probation office to inquire whether Bennett reported there. He did not even call the assistant manager at Blockbuster who had escorted Bennett to the police station.

In summary, a jury could conclude that Police Chief Cooke's supine, bureaucratic inaction constituted conscience-shocking deliberate indifference.

### 2. *Police Officer Illich*

Many of these criticisms of Cooke could of course be leveled at Illich. But in our view Illich's behavior does not reach the conscience-shocking level. Illich was an inexperienced employee who went to his supervisor for help. Once Illich briefed Cooke on the details of Bennett's attempt to surrender, Cooke took over and made the decision that Bennett should be released. Because Illich realized he was confronted with an unusual situation, went to his supervisor for help, and then deferred to his supervisor's instruction, Illich's conduct could not shock the conscience of a reasonable jury.

### 3. *Dispatcher Lewandowski*

Nor could police dispatcher Lewandowski's conduct be deemed to shock the conscience of a reasonable jury. Lewandowski correctly performed the search of NCIC, CLEAN, and the County Bench Book. She told Illich that a warrant was listed. She called the Prison to confirm the warrant, and reported to Illich that the warrant could not be found. While performing these tasks, she monitored the radio in order to receive calls from other officers. The worst that can be said of Lewandowski is that she was negligent. But negligence is not a legitimate basis to conclude that a state actor's conduct shocks the conscience.

### 4. *Booking Specialist Shannon*

Michelle Shannon was an entry-level employee with no law enforcement experience and no formal training on handling of warrants. While reasonable jurors could find her negligent, we believe that such

jurors could not find her carelessness in searching for the warrant to shock the conscience. Employee incompetence, being not unusual, is not shocking and is not the kind of outrageous abuse of power against which the Fourteenth Amendment Due Process Clause guards. *See Lewis,* 523 U.S. at 846–47, 118 S.Ct. 1708 (explaining that only executive behavior that is brutal, offensive, or otherwise egregious is conscience shocking and, thus, arbitrary in the constitutional sense); *see generally Collins v. City of Harker Heights, Texas,* 503 U.S. 115, 129, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992).

### D. *Was there some relationship between the State and the plaintiffs?*

There must be "some relationship" between plaintiffs and the State which would make the plaintiffs foreseeable victims in the tort sense. We note that some circuits have implicitly rejected the "some relationship" requirement of the *Kneipp* test. As the Seventh Circuit has stated, "When the police create a specific danger, they need not know who in particular will be hurt" for "[s]ome dangers are so evident, while their victims are so random, that state actors can be held accountable by any injured party." *Reed v. Gardner,* 986 F.2d 1122, 1127 (7th Cir.1993); *see generally* Matthew D. Barrett, *Failing to Provide Police Protection: Breeding a Viable and Consistent 'State–Created Danger' Analysis for Establishing Constitutional Violations under Section 1983,* 37 Val. U.L.Rev. 177, 218–19 (2002) (describing the divergent approaches of the circuits on whether there must be a foreseeable plaintiff).

While it has been refined, neither the Supreme Court nor our Court of Appeals have repudiated the "some relationship" test. Our task thus remains to assess whether "some relationship" between plaintiffs and the State has been established.

Gerald Bennett lived in an apartment with Roxanne and Amanda Leidy when he attacked them, a fact the defendant state actors did not know. Even if Illich or Cooke had asked Bennett his address, it is not clear that Bennett would have given them the address of the apartment where he lived with plaintiffs. Bennett was a transient who resided at several addresses. DePaulis Dep. at 25–26. Moreover, the defendants had no reason to know that Bennett posed a particular risk of harm to the women with whom he lived.

It is true that to be a foreseeable plaintiff within the meaning of the some relationship test, the particular plaintiff need not have *necessarily* been foreseeable. It is enough that the plaintiff is among a *class* of foreseeable victims. *Kneipp,* 95 F.3d at 1209 n. 22; *Morse v. Lower Merion School Dist.,* 132 F.3d 902, 912–14 (3d Cir.1997). The Court of Appeals in *Morse* left undecided the "by no means [ ] easy question" of whether "all those present in Lower Merion High School" constituted a sufficiently distinct class of persons to be a foreseeable class within the meaning of the some relationship test. *Id.* at 914.

Even viewing the question as whether Roxanne and Amanda Leidy were part of a class of foreseeable victims, we must conclude that plaintiffs do not satisfy the "some relationship" element. Roxanne Leidy and Amanda Leidy were foreseeable to the defendants only in the general sense that they were female residents of Delaware County. This made them part of a vast and diffuse, rather than discrete, class of foreseeable victims as *Kneipp* requires. *See Morse,* 132 F.3d at 912–14.

### E. *Municipal Liability*

■ In addition to the individual defendants, plaintiffs assert a claim of substantive due process against the municipal defendants and other subdivisions of the

state—Glenolden Borough, Delaware County, Delaware County Board of Prison Inspectors, and the for-profit prison operator Wackenhut. For these defendants to be held responsible for the deprivation of a constitutional right, they must be "the moving force" behind the constitutional violation. *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Municipal policy, practice, or custom must cause the deprivation of the constitutional right. *See id.* at 690–91, 694, 98 S.Ct. 2018.

A jury could conclude that policies or practices of these defendants caused Gerald Bennett to be released when he came to surrender. The Delaware County and Glenolden Borough practice of "checking" and "confirming" warrants could be seen as fostering Bennett's release. Further, the Delaware County Board of Prison Inspectors' acquiescence as Wackenhut transferred responsibility for retrieving warrants to poorly-trained entry-level workers could reasonably be seen as rendering the Delaware County Board of Prison Inspectors and Wackenhut responsible as well. The lax training of the entry-level workers tasked with handling the warrants led directly to the booking specialist, Michelle Shannon, missing Bennett's warrant.

Nevertheless, while we do not dispute the causal nexus between the policies and practices of the municipal defendants and Wackenhut and Bennett's release, the defendants cannot be held liable because their behavior did not cause the deprivation of a constitutional right. As we have explained, the failure of the government to protect citizens from crime, without more, does not violate the Fourteenth Amendment.

### F. Conclusion

By our holding, we do not condone defendants' behavior. Roxanne and Amanda Leidy endured unspeakable horrors in part because of some defendants' lassitude and incompetence. As plaintiffs' expert put it, "Threads of missed opportunities and failure to perform routine investigative steps wove themselves into a braid of events which ultimately culminated in a horrible tragedy which most certainly would have been averted if everyone in the system had done their jobs properly." Expert Report of O'Reilly at 10.

The fact of the matter is that the sufficiency of protective services is for the people, through their elected representatives, to decide. *See DeShaney* at 196, 109 S.Ct. 998. Just as Delaware County (through the private prison company Wackenhut) saved money by replacing trained correctional officers with entry level employees, jurisdictions throughout the country are faced with the difficult task of deciding how to spend scarce public resources. Though the defendants here surely will win no awards for good law enforcement, the quality and breadth of police protection is the preserve of the states and not judges and juries under the Fourteenth Amendment, at least as the Supreme Court in has construed it.

### IV. State Law Analysis [19]

Plaintiffs also assert claims under state law. They first allege negligent infliction of emotional distress against Wackenhut and the individual defendants.

The Pennsylvania Political Subdivision Tort Claims Act immunizes individual officials from liability for personal injuries to the same extent as the local agencies that employ them except, howev-

---

**19.** We exercise our supplemental jurisdiction because of the need, after so much legal exer-

tion by all concerned, to bring this painful matter to a close.

er, that individual officials may be held liable for acts amounting to actual fraud, actual malice, or willful misconduct. *See* 42 Pa. C.S. §§ 8541–42, 8545, 8550. Since there is no evidence from which a jury could find that the individual-official defendants intended to violate the law or to bring about the harm that resulted to the plaintiffs, we are constrained to conclude that under the Act they are immune from liability for negligent infliction of emotional distress. *See Brown v. Muhlenberg Township,* 269 F.3d 205, 219 (3d Cir.2001) (defining willful misconduct as entailing intent to harm); *Sameric Corp. of Del., Inc. v. City of Philadelphia,* 142 F.3d 582, 600–01 (3d Cir.1998) (defining willful misconduct as involving knowledge that conduct is unlawful). This leaves us to consider the tort against remaining defendants Wackenhut and Michelle Shannon.

■ Negligent infliction of emotional distress affords relief for emotional distress caused by contemporaneous observation of an injury to a close relative. *Mazzagatti v. Everingham,* 512 Pa. 266, 516 A.2d 672 (1986). Minor plaintiff Amanda Leidy not only was sexually attacked by Gerald Bennett, but was in the apartment when he strangled her mother. There can be no doubt that the young Ms. Leidy suffered lasting and profound distress as a consequence of Bennett's terrible criminal acts. The only question is whether the distress that she endured can be attributed to the negligence or other tortious behavior of the defendants. While negligent infliction of emotional distress affords a remedy to the close relatives of victims, there must be an underlying tort.[20] The issue becomes whether the murder of Roxanne Leidy can be attributed to the negligence of Wackenhut or Michelle Shannon.[21]

Negligence consists of four elements: a duty recognized by law requiring the defendant(s) to conform to a certain standard of conduct; failure to conform to the standard required; a causal connection between the conduct and injury; and actual damages or loss. *Morena v. South Hills Health Sys.,* 501 Pa. 634, 462 A.2d 680, 684 n. 5 (1983). In general, the law recognizes no duty to protect others from harm. *Emerich v. Phila. Ctr. for Human Dev.,* 554 Pa. 209, 720 A.2d 1032, 1036 (1998) ("Under common law, as a general rule, there is no duty to control the conduct of a third party to protect another from harm."); *Restatement (Second) of Torts* § 315 (1965). Therefore, to hold defendants Shannon and Wackenhut responsible for the criminal torts Bennett committed, plaintiffs invoke the following exception, which the *Restatement* suggests to the general rule:

> § 324A  Liability to Third Person for Negligent Performance of Undertaking
>
> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as nec-

---

**20.** Put differently, if the defendant is not liable for the personal injury to the victim, then he or she is not liable for the emotional distress caused to the relative of the victim. Liability for the personal injury is a threshold matter that must be established before liability to the bystander can be proved. *See, e.g., Everingham,* 516 A.2d at 674, 677 (negligent infliction of emotional distress asserted by relative of child run over by negligent driver); *Sinn v. Burd,* 486 Pa. 146, 404 A.2d 672, 674 (1979) (same); *Sonlin v. Abington Memorial*

*Hosp.,* 748 A.2d 213, 215 (Pa.Super.2000) (negligent infliction of emotional distress asserted by family of child permanently injured by medical malpractice).

**21.** We apply Pennsylvania law, and, where the issue at bar has not been addressed by the Pennsylvania Supreme Court, we hazard to predict how the Pennsylvania Supreme Court would decide it. *Boyanowski v. Capital Area Intermediate Unit,* 215 F.3d 396, 406 (3d Cir. 2000).

essary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

*Restatement (Second) of Torts* § 324A (1965). We will consider cases in which the courts of Pennsylvania have recognized a duty under § 324A to assess whether or not § 324A of the *Restatement* supplies a duty here.

In *Emerich*, 720 A.2d at 1040, the Supreme Court of Pennsylvania recognized a duty of a psychiatrist to warn "a specifically *identified or readily identifiable*" third person about whom a patient has communicated "a specific and immediate threat of serious bodily harm." In that case, a patient disclosed to his psychiatrist that he intended to kill his exgirlfriend. *Id.* at 1034–35.

In *DiMarco v. Lynch Homes–Chester County*, 525 Pa. 558, 583 A.2d 422, 424–25 (1990), the Pennsylvania Supreme Court recognized the duty of a doctor to warn a patient with hepatitis to refrain from sexual relations. Similarly, in *Troxel v. A.I. Dupont Institute*, 450 Pa.Super. 71, 675 A.2d 314, 316, 321 (1996), the Superior Court recognized the duty of a doctor to warn a patient with cytomegalovirus, a

disease which is particularly contagious to pregnant women, to avoid physical proximity to women who are pregnant.

Though plaintiffs rely on *Troxel* and *DiMarco*, subsequent cases disclose that those cases turn on the peculiar nature of infectious diseases, the unique expertise of physicians, and the limited and relatively controllable class of persons whom a patient with a communicable disease is likely to infect. In two cases after *DiMarco*, the Pennsylvania courts declined the invitation to extend *DiMarco* beyond infectious diseases. *Witthoeft v. Kiskaddon*, 557 Pa. 340, 733 A.2d 623 (1999) (deciding that failure of doctor to warn patient and Pennsylvania Department of Transportation about poor visual acuity does not render doctor liable to third person whose car the patient strikes); *Crosby v. Sultz*, 405 Pa.Super. 527, 592 A.2d 1337 (1991) (same). The lynchpin of both decisions was that a defendant does not ordinarily owe a duty to a plaintiff who is no more a foreseeable victim than the public at large. *See Witthoeft*, 733 A.2d at 629–30; *Crosby*, 592 A.2d at 1345.

Recently, in *F.D.P. v. Ferrara*, 804 A.2d 1221 (Pa.Super.2002) the Pennsylvania Superior Court addressed the question whether a mental health institution had a duty to a child whom a child molester released on furlough sexually assaulted. The Court recalled the general rule that there is no duty to protect third persons from harm and held that no exception to the general rule applied.[22] *Id.* at 1228–32.

■ Because the law does not recognize a duty to protect others from harm,

---

**22.** We also note that recently the Alabama Supreme Court, following the decisions of other state courts on the subject, held that, in the absence of a special relationship with the plaintiff or the foreseeability that the plaintiff would come to harm, a prison does not have a duty of care towards the victim of a crime by an escaped inmate. *See Alabama Department of Corrections v. Thompson*, No. 1001191, 2003 WL 329168 (Ala. Feb. 14, 2003). Given the extreme consequences the opposite holding would have, we suspect the Pennsylvania Supreme Court would follow Alabama's lead.

and the case law does not warrant finding that an exception to that general rule exists here, we conclude that Wackenhut and Shannon did not have a duty to protect Roxanne and Amanda Leidy from Bennett. Consequently, the claim of negligent infliction of emotional distress must fail. The claim of negligent hiring and supervision also fails because neither Wackenhut nor Shannon breached a duty of care toward plaintiffs.

Since all substantive claims will be dismissed, state law claims that are derivative of them—namely, wrongful death and survival—will be dismissed as well.

An appropriate Order will follow.

## ORDER

AND NOW, this 13th day of August, 2003, upon consideration of the motion for summary judgment of Wackenhut Corrections Corporation and Michelle Shannon (Doc. No. 30), the motion for summary judgment of County of Delaware, Delaware County Board of Prison Inspectors, and Raquel Lewandowski (Doc. No. 31), and the motion for summary judgment of the Borough of Glenolden, Edward Cooke, and Matthew Illich (Doc. No. 32), and the responses and replies thereto, in accordance with the Memorandum issued this day, it is hereby ORDERED that:

1. The motions for summary judgment are GRANTED;

2. JUDGMENT IS ENTERED in favor of defendants, Wackenhut Corrections Corporation, Michelle Shannon, County of Delaware, Delaware County Board of Prison Inspectors, Raquel Lewandowski, Borough of Glenolden, Edward Cooke, and Matthew Illich, and against plaintiffs, David W. Leidy and Kathleen E. Leidy, individually and as co-representatives of the Estate of Roxanne Leidy and co-guardians of the minor Amanda Leidy; and

3. The Clerk shall CLOSE this case statistically.