

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-24-2004

# Liedy v. Glenolden

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-3539

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Liedy v. Glenolden" (2004). *2004 Decisions.* Paper 120.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/120

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 03-3539

DAVID W. LIEDY; KATHLEEN E. LIEDY, individually and as
co-personal representatives of the Estate of Roxanne Liedy
and as the guardians of Amanda Liedy, a minor,
Appellants

v.

BOROUGH OF GLENOLDEN; EDWARD COOKE, individually and as a
police officer; JOHN/JANE DOE #1, EMPLOYEE OF GLENOLDEN
POLICE DEPARTMENT; COUNTY OF DELAWARE OFFICE OF THE DISTRICT
ATTORNEY; JOHN/JANE DOE #2, EMPLOYEE OF DELAWARE COUNTY;
DELAWARE COUNTY BOARD OF PRISON INSPECTORS; WACKENHUT
CORECTIONS CORP., ta WWC; JOHN/JANE DOE #3, EMPLOYEE OF
WACKENHUT CORRECTIONS CORP.; MATTHEW ILLICH; RAQUEL
LEWANDOWSKI

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(Civ. A. No. 01-4361)
District Judge: The Honorable Stewart Dalzell

———————

Submitted Pursuant to LAR 34.1(a)
November 19, 2004

———————

Before:  ROTH and SMITH, *Circuit Judges*, and DEBEVOISE,* *District Judge*

(Filed: November 24, 2004)

———————

OPINION OF THE COURT

———————

* The Honorable Dickinson R. Debevoise, Senior District Judge for the District of New
Jersey, sitting by designation.

SMITH, *Circuit Judge*

Appellants David and Kathleen Leidy are the brother and sister-in-law of the decedent, Roxanne Leidy, and the co-personal representatives of her estate. At the time of the complaint, Appellants were also the guardians of the then-minor plaintiff, daughter of the decedent, and rape victim, Amanda Leidy. The remaining Appellees are the Borough of Glenolden, its Police Chief, Edward Cooke, and a Glenolden Patrolman, Matthew Illich (collectively "Glenolden Defendants"). The Leidys sued the Glenolden Defendants alleging that their failure to act deprived Roxanne and Amanda Leidy of their liberty in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution. The District Court granted summary judgment for the Glenolden Defendants. We Affirm.

**Facts**

The facts of Gerald Bennett's unsuccessful surrender on an arrest warrant six days before he perpetrated the heinous crimes on Roxanne and Amanda Leidy are captured in great detail in the District Court's opinion. *See Leidy v. Glenolden*, 277 F. Supp. 2d 547, 550-557 (E.D. Pa. 2003). We recount here only those facts necessary to our decision.

Gerald Bennett served nearly a year in prison following his guilty plea to indecent assault. A condition of his February 1999 parole was that he attend sex offender treatment classes. Because Bennett repeatedly failed to attend treatment,

2

admitted to using drugs, and refused to divulge his address, his probation officer obtained a bench warrant for his arrest, and instructed Bennett to turn himself in to police.

At 5:42 p.m. on August 26, 1999, Bennett appeared at the Glenolden Police Station to surrender on the warrant. Bennett told the officer on duty, Matthew Illich, that he was turning himself in at the direction of his probation officer, but did not tell Illich the nature of the charges for which he was on parole, nor did he give his address. Glenolden's departmental policy required a "hard copy" verification of the warrant to take into custody a person surrendering on a bench warrant. Illich took Bennett's identification information, and, according to Glenolden practice, Illich contacted the Delaware County Emergency Communications Center ("DelCom") to confirm the existence of the warrant.

The DelCom dispatcher's check of two electronic databases and the Delaware County "bench book" indicated that an outstanding warrant for Bennett's arrest existed. After relating this information to Illich, the DelCom dispatcher then called the Delaware County Prison's Intake Unit, where the actual warrants were kept, to confirm its existence. Because of a communication error between the DelCom dispatcher and the Intake Unit's clerk, the clerk found neither a listing of the warrant in the electronic list of all Delaware County bench warrants nor the warrant itself in the file cabinet. Illich and Police Chief Edward Cooke, who by this time had been consulted by Illich and who

3

himself had talked with Bennett, determined that without a "hard copy" of the warrant, they could no longer hold Bennett.[1]  Bennett left the police station at approximately 6:28 p.m.

While DelCom and the Intake Unit were checking for Bennett's warrant, Illich had contacted Constable Jerry Bosch to drive to the station to transport Bennett to the prison.  When informed that the warrant could not be located at the prison, Bosch contacted the Intake Unit himself, and relaying Bennett's information accurately, determined that in fact the warrant for Bennett's arrest was on file at the prison.  When Bosch notified Illich, Illich went in fruitless search of Bennett, who had left the station just five to ten minutes before.  Six days later, Bennett strangled and killed Roxanne Leidy, in whose house he had been boarding, and raped Amanda Leidy at knifepoint.

**Jurisdiction and Standard of Review**

The District Court exercised federal question jurisdiction, 28 U.S.C. § 1331, over the plaintiffs' civil rights claim, 42 U.S.C. § 1983.  We have jurisdiction over this

---

[1]  The Delaware County and Glenolden Police Department policy of confirming the existence of the warrant with the Intake Unit has three related rationales.  First, the electronic databases and the "bench book" are not legal documents.  Second, because they are merely derivative of warrants, these sources add a layer of  human error (potentially indicating a warrant on a citizen when none ever existed), and include "stale" warrants, the information of which has not yet been updated in the database (potentially showing as "active" a warrant that has been rescinded).  Third, the prison will not accept an inmate unless the constable has a warrant for the person in custody. Confirming warrants thus protects citizens from wrongful arrest by reducing clerical error and ensuring that only active warrants are enforced.

appeal of the District Court's final judgment, 28 U.S.C. § 1291.[2]

Our review of the District Court's grant of summary judgment is plenary. *DeFelice v. Aetna Healthcare*, 346 F.3d 442, 445 (3d Cir. 2003). We apply the same test used by the District Court, i.e., whether, viewing the evidence in the light most favorable to the non-moving party, the moving party has met its threshold burden of showing the absence of a genuine issue of material fact. *O'Donnell v. United States*, 891 F.2d 1079, 1081-82 (3d Cir. 1989). Essentially, the inquiry becomes "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986). Further, "[i]t follows from the[] settled principles [of summary judgment standards] that if the factual context renders [the nonmoving parties'] claim implausible . . . [they] must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matushita Elec. v Zenith Radio,* 475 U.S. 574, 587 (1986); *see Williams v. West Chester*, 891 F.2d 458, 460 n.2 (3d Cir. 1990) ("Matsushita's principles arguably apply only to summary judgment motions in antitrust cases. At the very least, however, this language reinforces the point made more generally in *Liberty Lobby*.").

**Discussion**

---

[2] The District Court also exercised supplemental jurisdiction over the plaintiffs' state tort claims against the individual defendants, 28 U.S.C. § 1367, but the Leidys have not appealed the District Court's determination that the defendants before us are immune from liability on these claims.

5

Section 1983 provides a civil remedy for plaintiffs who have been deprived of a right secured by the Constitution or federal law by a person acting under color of state law. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981). Although the state generally has no affirmative duty to protect citizens from the violent acts of private parties, this Court has joined several courts of appeals in recognizing § 1983 claims under the "state-created danger theory of liability." The Leidys base their civil rights claim on this theory.

The state-created danger theory was first suggested by the Supreme Court in *DeShaney v. Winnebago County*. 489 U.S. 189, 201 (1989) (noting that § 1983 liability may lie if the state played a part in creating, or rendering a person more vulnerable to, a danger). This Court adopted the theory in *Kniepp v. Tedder.* 95 F.3d 1199, 1201 (3d Cir. 1996). The state-created danger theory requires a plaintiff to establish each of four common elements :

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.

*Kniepp*, 95 F.3d at 1208 (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir. 1995)).

The Leidys' failure on the fourth element of the state-created danger analysis was the "fundamental reason" the District Court rejected the plaintiffs' civil rights claim.

6

We agree with the District Court's determination regarding this element, and we limit our discussion to it.

Often stated in terms of the difference between affirmative acts by government officials, in which case § 1983 liability may attach, *see Wood v. Ostrander*, 879 F.2d 583, 588 (9th Cir. 1989) (acts of arresting a driver, impounding his vehicle, and leaving a woman alone at night in a high-crime area a sufficient "assertion of government power"); *Cornelius v. Town of Highland Lake*, 880 F.2d 348, 357 (11th Cir. 1989) (placing inmates incarcerated for violent crimes in work release program without adequate supervision "affirmatively created a potentially dangerous situation"), and omissions by them, in which case § 1983 liability is precluded, *see Estate of Amos v. City of Page*, 257 F.3d 1086, 1091 (9th Cir. 2001) (poor rescue attempt did not increase the danger to person who left the scene of an accident); *Gregory v. City of Rogers*, 974 F.2d 1006, 1012 (8th Cir. 1992) (en banc) (removing designated driver from vehicle, leaving intoxicated occupant who later crashed car did not affirmatively place occupant in danger), this Court has noted the difficulty in drawing this distinction in particular cases. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 914-15 (3d Cir. 1997) (citing *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982). To better distinguish cases in which a state actor can be said to have "created" a theretofore nonexistent opportunity for a third party to perpetrate a crime from those constituting a "mere" failure to protect, we have observed that "the dispositive factor appears to be

7

whether the state in some way placed the plaintiff in a dangerous position that was foreseeable, and not whether the act was more appropriately characterized as an affirmative act or an omission." *Morse*, 132 F.3d at 915.

In *Kniepp*, police officers intercepted a couple in a shouting match as they walked home from a bar late on a cold night. The police allowed the husband to continue home to care for their child. Soon thereafter, the officers left a "severely inebriat[ed]" Samantha Kneipp unattended. She was later discovered unconscious on an embankment. She suffered complications from hypothermia which rendered her severely disabled. We determined that a reasonable jury could infer from the submitted evidence that by allowing the husband to leave the scene, the police implied that they would see Mrs. Kniepp home safely. Thus, we reversed the District Court's grant of summary judgment and remanded the case for a trial "as to whether the police officers affirmatively placed Samantha in a position of danger." *Kniepp*, 95 F.3d at 1211. By separating a visibly intoxicated Samantha Kniepp from her husband, her "source of protection" at the time, we reasoned that when they abandoned her, the police increased the danger that Mrs. Kniepp would suffer harm. *Id*. at 1210.

In *Morse*, by contrast, a back door to a school, which was normally locked, was kept unlocked and occasionally propped open while various contractors worked on the school. A mentally ill local resident entered the school, likely through the unsecured back door, and fatally shot a teacher, Diane Morse. The victim's family brought a §

8

1983 action alleging that the school's action of unlocking the door and allowing public access to Morse's classroom subjected her to a dangerous situation. Although unlocking the back door and enabling unfettered access to the school was arguably an affirmative act, we denied the civil rights claim because the "deadly attack was not a foreseeable and fairly direct result of defendants' behavior." *Morse*, 132 F.3d at 915-16.

Here, the District Court characterized the defendants' failure to arrest as simply a failure to protect citizens from Bennett by not incapacitating him, and observed that the lesson of *DeShaney* and the state-created danger line of cases is that a failure to protect, without "something more," does not satisfy § 1983. 277 F. Supp. 2d at 560; *id.* at 561 (illustrating that the "something more" may be an official instigation of private violence, officers "plac[ing] people in harm's way who would otherwise not have been at risk," or officers "cut[ting] people off from their private sources of protection"). After noting that the state protected citizens from Bennett earlier by imprisoning him and placing him on parole upon his release, and attempted to do so by issuing a bench warrant, the District Court concluded: "In the absence of any state action, Bennett still would have committed these offenses, or, to put it another way, there is no evidence to conclude that he would not have. State action neither made Bennett more violent nor made Roxanne Leidy and Amanda Leidy more vulnerable to Bennett." *Id.* at 560. We agree with this assessment, and reject the plaintiffs' argument that the District Court

9

misunderstood the essence of their claim.

The plaintiffs contend that the Glenolden Defendants did not simply fail to protect the Leidys; rather, they assert that the "something more" was that the defendants' failure to arrest Bennett placed the victims in harm's way by emboldening Bennett to commit these extreme acts of violence. The plaintiffs further hypothesize that the warrant itself "placed stressful influences on Bennett," and that his "narrow[] escape" from police after the warrant's issuance may have led Bennett "to believe that he could thumb his nose at the Courts, Probation Office, and society," thus making Bennett's heinous crimes more likely.

The plaintiffs' implausible conjecture, so far removed from the evidence, could not lead a factfinder to reasonably conclude that the defendants' conduct "placed the plaintiff in a dangerous position that was foreseeable." *Morse,* 132 F.3d at 915. Bennett voluntarily attempted to turn himself in on an arrest warrant. There was no indication that the officers knew Bennett was capable of committing such violent, heinous crimes, much less that he was on the verge of doing so. Bennett simply stated that his probation officer told him to turn himself in for violating his parole. Absent an indication from Bennett himself, the defendants had no way of knowing that the violation underlying Bennett's parole involved a sex crime. As the plaintiffs note, Bennett had no reported criminal contact with police in the six month interim between his parole and August 26, 1999, nor did Bennett provide an address to Illich or Cooke that would have enabled

10

them to track down and arrest Bennett once the existence of a warrant was verified. Indeed, Bennett's transience was a factor that led the probation officer to seek a bench warrant for his arrest. This observation speaks not only to the inability of Glenolden police to seek Bennett in the days between his attempted surrender and his crimes, it also indicates that the defendants were unable to foresee the Leidys as potential victims. *See Morse*, 132 F.3d at 913 n.12 ("Where the state actor has allegedly created a danger towards the public generally, rather than an individual or group of individuals, holding a state actor liable for the injuries of foreseeable plaintiffs would expand the scope of the state-created danger theory beyond its useful and intended limits."). The Glenolden Defendants were thus entitled to summary judgment as a matter of law.

We note for the sake of completeness that because we conclude that there was no constitutional tort in this case, there also is no municipal liability to attach to the Borough of Glenolden. *Monnell v. Dep't of Social Serv's of the City of New York*, 436 U.S. 658, 691 (1978); *Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003). The judgment of the District Court is affirmed.