

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-18-2008

# Walter v. Pike Cty PA

Precedential or Non-Precedential: Precedential

Docket No. 06-5034

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Walter v. Pike Cty PA" (2008). *2008 Decisions.* Paper 441.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/441

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————

Nos. 06-5034, 06-5144, and 07-1668

————

SUSAN L. WALTER, Individually and
as Administratrix of the Estate of
Michael F. Walter, deceased;
MICHAEL V. WALTER;
LIANNA WALTER, a minor, and
through Susan L. Walter, per
parent and natural guardian;
DONNA WALTER, a minor, by
and through Susan L. Walter,
her parent and natural guardian;
ERIK WALTER, a minor, by
and through Susan L. Walter,
his parent and natural guardian;
DANIEL WALTER, a minor, by
and through Susan L. Walter,
his parent and natural guardian;
KASEY WALTER, a minor, by
and through Susan L. Walter,
her parent and natural guardian;
DARIAN WALTER, a minor, by
and through Susan L. Walter,
her parent and natural guardian;
DALE WALTER, a minor, by
and through Susan L. Walter,

his parent and natural guardian;
DEVYN WALTER, a minor, by
and through Susan L. Walter,
her parent and natural guardian;
CORINNE WALTER, a minor, by
and through Susan L. Walter,
her parent and natural guardian;
SEAN MICHAEL FRANCIS WALTER, a minor,
by and through Susan L. Walter,
his parent and natural guardian

v.

PIKE COUNTY, PENNSYLVANIA, AND THE PIKE
COUNTY DISTRICT ATTORNEY'S OFFICE; WESTFALL
TOWNSHIP, PENNSYLVANIA, AND THE WESTFALL
TOWNSHIP POLICE DEPARTMENT; TIMOTHY J.
MITCHELL, INDIVIDUALLY AND AS CHIEF OF
POLICE OF WESTFALL TOWNSHIP, AND
SEPARATELY AS COUNTY DETECTIVE FOR PIKE
COUNTY DISTRICT ATTORNEY'S OFFICE; DOUGLAS
J. JACOBS, ESQUIRE, INDIVIDUALLY AND AS
DISTRICT ATTORNEY OF PIKE COUNTY,
PENNSYLVANIA; BRUCE DeSARRO, ESQUIRE,
INDIVIDUALLY AND AS ASSISTANT DISTRICT
ATTORNEY OF PIKE COUNTY, PENNSYLVANIA; AND
WILLIAM TRACY TODD, INDIVIDUALLY AND AS
CHIEF COUNTY DETECTIVE OF PIKE COUNTY,
PENNSYLVANIA

2

Douglas J. Jacobs; Bruce DeSarro,

Appellants in No. 06-5034

Patti-Lynn Mitchell,

Appellant in No. 06-5144

Susan L. Walter, Michael V. Walter,
Lianna Walter, Donna Walter,
Erik Walter, Daniel Walter,
Kasey Walter, Darian Walter,
Dale Walter, Devyn Walter,
Corinne Walter, Sean Michael Francis Walter,

Appellants in No. 07-1668

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No.  03-cv-01690)
District Judge:  Honorable A. Richard Caputo

_____

Argued April 16, 2008

3

Before: AMBRO, FISHER and MICHEL,[*] *Circuit Judges*.

(Filed: September 18, 2008)

John A. Orlando (Argued)
Mary E. Dixon
White and Williams LLP
1800 One Liberty Place
Philadelphia, PA 19103
    *Attorneys for Susan L. Walter, et al.*

Michael J. Donohue (Argued)
Kreder Brooks Hailstone LLP
220 Penn Ave., Suite 200
Scranton, PA 18503

Susan B. Ayers, Esq.
David M. Maselli, Esq.
Wright & O'Donnell
15 East Ridge Pike
Suite 570
Conshohocken, PA 19428
    *Attorney for Patti-Lynn Mitchell*
    *Executrix of the Estate of Timothy Mitchell*

Gerard J. Geiger (Argued)

---

[*]The Honorable Paul R. Michel, Chief Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

4

Newman, Williams, Mishkin, Corveleyn,
   Wolfe & Fareri, P.C.
712 Monroe Street
P.O. Box 511
Stroudsburg, PA 18360
        *Attorney for Douglas J. Jacobs and Bruce DeSarro*

---

## OPINION OF THE COURT

---

MICHEL, *Chief Circuit Judge*.

In 2001, in Westfall Township, Pike County, Pennsylvania, Joe Stacy sexually assaulted Michael Walter's daughters. Walter then participated in Stacy's arrest, alongside Westfall Township Chief of Police Timothy Mitchell, and with the approval of the Pike County District Attorney's office. Stacy was charged and released on bail. In 2002, shortly before Stacy was to stand trial for the sexual assault, with Walter set to be a witness against him, Stacy began stalking Police Chief Mitchell, unbeknownst to Walter. Stacy then murdered Walter in broad daylight at Walter's place of business.

In 2003, Walter's widow and children sued Mitchell, District Attorney Douglas Jacobs, and Assistant District Attorney Bruce DeSarro, alleging, inter alia, that they violated Michael Walter's right to substantive due process (1) by involving Walter in Stacy's 2001 arrest and confession, and (2)

by failing to warn Walter in 2002 when Stacy began stalking Mitchell. Mitchell moved for summary judgment on the basis of qualified immunity, and DeSarro and Jacobs moved for summary judgment on the basis of both qualified and absolute (prosecutorial) immunity. In 2006, Mitchell died, and the District Court ruled on these summary judgment motions, (1) denying absolute immunity to DeSarro and Jacobs, (2) granting qualified immunity to DeSarro and Jacobs for their failure to warn Walter in 2002, (3) denying qualified immunity to DeSarro and Jacobs for their involvement in the 2001 arrest of Stacy, and (4) denying qualified immunity to Mitchell for either the 2001 arrest or the 2002 failure to warn.

DeSarro, and Jacobs, and Mitchell's estate now appeal from the District Court's partial denial of immunity (which is appealable under the collateral order doctrine), and the Walters cross-appeal from the District Court's partial grant of immunity and summary judgment. For the reasons that follow, we will affirm the District Court's ruling that DeSarro and Jacobs are entitled to qualified immunity for their failure to warn Walter in 2002. We will reverse the District Court's rulings that DeSarro and Jacobs are not entitled to qualified immunity for their involvement in the 2001 arrest of Stacy, and that Mitchell is not entitled to qualified immunity for either the 2001 arrest of Stacy or the 2002 failure to warn Walter. Because we will hold that Mitchell, DeSarro and Jacobs are entitled to qualified immunity for the events of 2001 and 2002, we will remand to the District Court with instructions to grant judgment against the Walters'

6

substantive due process claim on this basis, and we will decline to reach DeSarro's and Jacobs' claim to absolute immunity.

# I.  BACKGROUND

## A.  Joe Stacy Assaults Michael Walter's Children

Michael Walter lived with his wife Susan and their ten children in Westfall Township.  Joe Stacy also lived in Westfall Township with his wife Agnes.  Michael Walter knew Joe Stacy through the Westfall Township Planning Board, but did not know that Stacy was a convicted felon who had served six years in prison for manslaughter and had later been prosecuted for another gun-related incident.  In August of 2001, Mr. and Mrs. Walter took a weekend trip out of state, leaving three of their young daughters in the care of the Stacys.  When the Walters returned, their daughters told Mrs. Walter that they had been sexually assaulted by Joe Stacy.

The Walters called the police.  Police Chief Mitchell, who was a member of the Pike County Child Abuse Task Force, met with Mr. and Mrs. Walter at their home on August 14, 2001.  Mitchell told the Walters about Stacy's criminal record, and the Walters decided to press criminal charges for the sexual assault.  The parties dispute whether or not Mitchell promised police protection to the Walters on August 14, 2001, and whether the Walters' decision to press charges was based in part on a promise of protection.  But in either event, once the Walters had

7

decided to proceed with criminal charges, Mitchell and assistant district attorney DeSarro interviewed the Walters' daughters, and the police obtained an arrest warrant for Stacy and a search warrant for Stacy's home.

Soon thereafter, Mitchell and DeSarro met again with the Walters to discuss a plan for arresting Stacy. At base, the plan was for Michael Walter to lure Stacy over to the Walters' house, where Mitchell would then arrest him. But the parties dispute the motivation for this plan, the exact details of the plan, and who had notice of which details when.

The Walters allege in their Amended Complaint that the plan was formulated by Mitchell, DeSarro, Jacobs, and Pike County detective William Tracy Todd, and that the plan called not only for Michael Walter to lure Stacy away from Stacy's own house (where the police were afraid Stacy would be able to start a gun battle with arresting officers), but also for Walter to extract a confession from Stacy before he was arrested (so that Stacy could be prosecuted on the basis of the confession, sparing the Walters' daughters from having to testify against Stacy). The Walters allege that Mitchell "directed" Michael Walter to invite Stacy to the Walters' home.[1]

---

[1] However, when asked at deposition about who first came up with the idea of luring Stacy to the Walters' house, Mrs. Walter testified that it was Michael Walter who suggested the idea, and that Mitchell said he would have to get the plan approved by the

In contrast, Mitchell claims that he did not foist a plan on the Walters; rather, Michael Walter spontaneously volunteered to lure Stacy over, and Mitchell agreed but did not intend to use Walter to extract a confession from Stacy. DeSarro, for his part, claims that although he approved of having Walter invite Stacy to the Walters' house, he did not know about or approve of using Walter to extract a confession from Stacy. And Jacobs claims that he did not know about the plan at all until after the fact.

B.  Michael Walter Participates in Joe Stacy's Arrest

The parties essentially agree about how the arrest actually proceeded. On August 16, 2001, Stacy drove to the Walters' house, where he was met by Mitchell and Michael Walter. Mitchell talked to Stacy for some time, and then Stacy sought to speak to Walter. Mitchell asked Walter if he would speak to Stacy, and Walter agreed. Mitchell then left Stacy alone with Walter for a few minutes, and Stacy made incriminating statements to Walter about the sexual assault. When Mitchell returned, Stacy made incriminating statements to Mitchell, who administered <u>Miranda</u> warnings and placed Stacy under arrest. Stacy protested that Walter did not want Stacy arrested, and asked Mitchell to check. Mitchell then asked Walter, in earshot of Stacy, whether Walter really wanted Mitchell to arrest Stacy. Walter confirmed that he did, and Mitchell placed Stacy into

District Attorney's Office. Walter Dep. at 120.

9

custody.

The police then executed their search warrant for Stacy's home, finding a huge cache of weapons and ammunition, and the police re-arrested Stacy and charged him with illegal possession of firearms. A few days later, on August 21, 2001, Michael Walter wrote to District Justice Charles Lieberman to request that Stacy be remanded pending trial instead of released on bail. Walter's letter explained that he felt that Stacy was "a risk to my family and the community" and that there was "no guarantee of protection for my wife and ten children while I am at work." But the judge released Stacy on bail, on the conditions that Stacy stay away from the Walters, seek psychiatric help, and refrain from possessing firearms.

## C. Stacy Stalks Mitchell and Murders Walter

Stacy's trial for sexual assault of Walter's daughters was scheduled for July of 2002. The Walters allege that, as the trial approached, Stacy's behavior became increasingly menacing and threatening towards Mitchell, Jacobs, and Walter. For example, in January of 2002, Michael Walter received a prank call which he attributed to Stacy. Susan Walter also saw a man she thought looked like Stacy riding a bicycle on her street. Neither incident was ever confirmed to be attributable to Stacy, however.

In April of 2002, Stacy made a pre-trial motion to

suppress his August 16, 2001 confession, arguing that it resulted from a plan "to secure a confession through deception," which Stacy called a "trap designed by Officer Mitchell and Mr. Walter." Outside of court, Stacy called Mitchell repeatedly and in June of 2002 asked a local real-estate agent for Mitchell's home address. Mitchell told the real-estate agent to tell Stacy that Mitchell could be found at Mitchell's office at a certain time every day, and on July 1, 2002, Mitchell observed Stacy sitting in a car outside Mitchell's office at the given time. Mitchell arranged with DeSarro and Jacobs for police protection the next day in order to catch Stacy stalking him, and the Walters allege that Jacobs also arranged for protection for himself, including at his private law practice. But Stacy did not reappear on July 2, 2002. Mitchell and DeSarro sought to revoke Stacy's bail, citing Stacy's appearance at Mitchell's office the previous day, but the judge found that there were no grounds to have Stacy remanded.

The next day, July 3, 2002, Mitchell took leave from his job and left the vicinity of Pike County. The Walters allege that Mitchell was instructed to leave for his own protection, but Mitchell testified that he already had a vacation scheduled for that time and left work less than a day ahead of schedule. Meanwhile, Jacobs and DeSarro discussed whether or not to tell the Walters about Stacy's behavior toward Mitchell, and decided against it. DeSarro testified that if Stacy "was going to do something that was improper one way or another, it was going to be toward Detective Mitchell, and we had no reason to

11

believe [against] anyone else, at least in my mind." DeSarro also testified that he asked the state police to increase their patrol of the Walters' street on the weekend before Stacy's trial, but the Walters contend that there is no evidence corroborating that testimony.

On Friday, July 5, 2002, the last weekday before Stacy's trial was scheduled to begin, Stacy drove to Walter's place of employment at the Port Jervis auto mall in Port Jervis, New York, outside the jurisdiction of the Westfall Township Police and Pike County District Attorney's Office. According to Walter's coworker, Stacy entered the auto dealership and waited for a few minutes while Walter worked with a customer. When Walter was done with the customer, Stacy shot Walter in the groin and head, killing him. Stacy had written in a note to his wife, dated two days before the shooting, that he "hope[d] to get done what I believe is the best to do–someone has to pay for setting me up . . . ."

## D. The Walters File Suit

On September 25, 2003, after Stacy pleaded guilty to murdering Michael Walter and was sentenced under a plea agreement, the Walters filed a Complaint against Mitchell, DeSarro, Jacobs, Todd, Westfall Township, the Westfall Township Police Department, Pike County, and the Pike County District Attorney's Office, alleging violations of due process under 42 U.S.C. § 1983, and wrongful death and survival claims

12

under Pennsylvania state law.  The Walters filed an Amended Complaint on October 30, 2003, and the defendants filed motions to dismiss between October and December of 2003.

On August 20, 2004, the District Court dismissed the Walters' state-law claims for wrongful death and survival, their claim for punitive damages against Westfall Township and Pike County, and their due process claim against the Westfall Township Police Department.  The District Court also held that DeSarro and Jacobs were entitled to absolute immunity for their decisions regarding the re-arrest of Stacy or revocation of his bail, but were not entitled to absolute immunity for their acts pertaining to the investigation of Stacy, and that the Pike County District Attorney's Office was not subject to liability under 42 U.S.C. § 1983 for its prosecutorial acts.

On July 15, 2005, the defendants made various motions for summary judgment on the Walters' remaining claims.  On August 13, 2006, while those motions were still under submission, Mitchell died.  The District Court ruled on the summary judgment motions on November 29, 2006.  Walter v. Pike County, 465 F. Supp. 2d 409 (M.D. Pa. 2006) ("Walter").  Specifically, the District Court (1) granted summary judgment to Westfall Township, Pike County, and the Pike County District Attorney's Office on all outstanding claims, on the basis of municipal immunity, id. at 424-25; (2) granted summary judgment to Mitchell, DeSarro, and Jacobs on the Walters' procedural due process claim, id. at 422-24; (3) denied summary

13

judgment to Mitchell, DeSarro, and Jacobs on the merits of Walters' substantive due process claim, id. at 417-22; (4) denied Mitchell's motion for summary judgment on the basis of qualified immunity, id. at 426-38; denied DeSarro's and Jacobs' motion for summary judgment on the basis of absolute immunity, id. at 425-46; and (5) granted in-part and denied in-part DeSarro's and Jacobs' motion for summary judgment on the basis of qualified immunity, holding that DeSarro and Jacobs were entitled to qualified immunity "as to their failure to warn the Walter family of the threat posed by Joseph Stacy in the period leading up to the murder of Michael Walter," but were not entitled to qualified immunity "as to their involvement in the elicitation of the confession from Joseph Stacy on August 16, 2001." Id. at 429.

## E. The Parties Appeal

On December 9, 2006, DeSarro and Jacobs filed a timely notice of appeal from the District Court's denial of their motions for summary judgment on the basis of qualified and absolute immunity. On December 21, 2006, in light of Mitchell's death, the District Court granted a motion to substitute Patti-Lynn Mitchell in her representative capacity as the Executrix of the Estate of Timothy Mitchell, and that same day Mitchell's estate filed a timely notice of appeal from the denial of Mitchell's motion for summary judgment based on qualified immunity. On December 20, 2006, the Walters moved in the District Court for entry of partial final judgment pursuant to Fed. R. Civ. P. 54(b),

14

or in the alternative for certification of the District Court's summary judgment order for interlocutory appeal under 28 U.S.C. § 1292(b), so that they could appeal the District Court's ruling that DeSarro and Jacobs were entitled to qualified immunity as to their failure to warn the Walters.

On January 17, 2007, the District Court denied the Walters' motion for partial final judgment, but certified its November 29, 2006 summary judgment order for interlocutory appeal, writing that "the issue of whether District Attorney Defendants Douglas J. Jacobs and Bruce DeSarro are entitled to qualified immunity as to (A) their participation in the elicitation of a confession from Joseph Stacy on August 16, 2001, and (B) their failure to warn Michael Walter of the threat posed by Mr. Stacy in the period leading up to Mr. Walter's murder involves a controlling question of law as to which there is substantial ground for difference of opinion, and [] an immediate appeal from the order may materially advance the ultimate termination of the litigation." Walter v. Pike County et al., W.D. Pa. case no. 3:03-cv-01690-ARC, Docket No. 118. We granted the Walters' petition for interlocutory appeal on March 1, 2007, and the Walters filed a timely notice of appeal the next day. Shortly thereafter, we ordered that the three appeals be consolidated.

15

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

Because all three of these consolidated appeals come to us before the District Court has entered a final judgment in the case, we will begin with the issue of appellate jurisdiction.

#### 1. The Defendants' Appeals

Mitchell, DeSarro and Jacobs appeal from the denial of summary judgment. The Supreme Court has explained that appeal gives us "a power of review, not one of intervention," and as long as a matter remains "open, unfinished or inconclusive, there may be no intrusion by appeal." Cohen v. Benefit Indus. Loan Corp., 337 U.S. 541, 546 (1949). However, the Court has also identified a "small class" of decisions that, although short of final judgment on a claim or cause of action, "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." Id.

Decisions denying absolute or qualified immunity–such as the decisions appealed here by Mitchell, DeSarro, and Jacobs–can fall within this "small class," because their appellate consideration cannot be deferred until final judgment. "[T]he

16

essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action." Mitchell v. Forsyth, 472 U.S. 511, 525 (1985). Qualified immunity is also an "entitlement not to stand trial or face the other burdens of litigation," but is "conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law." Id. at 427. When either immunity is asserted in a district court, "it is effectively lost if a case is erroneously permitted to go to trial," and the district court's denial of immunity is "effectively unreviewable on appeal from a final judgment." Id. Therefore a district court's denial of a claim of absolute or qualified immunity, "to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." Id. at 530; Light v. Haws, 472 F.3d 74, 76 (3d Cir. 2007).

The Supreme Court has clarified that the scope of our review is limited, because "the collateral order doctrine does not permit an appeal from an order denying a motion for summary judgment if the issue raised is 'whether or not the evidence in the pretrial record [is] sufficient to show a genuine issue of fact for trial.'" Ziccardi v. City of Phila., 288 F.3d 57, 61 (3d Cir. 2002) (quoting Johnson v. Jones, 515 U.S. 304, 307 (1995)). Therefore "we lack jurisdiction to consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove; but we possess jurisdiction to review whether the set of facts identified by the

17

district court" supports a claim beyond the bounds of the immunity at issue–in the case of qualified immunity, whether that set of facts is "sufficient to establish a violation of a clearly established constitutional right." Id. If there are minor gaps in the District Court's factual recitation, "we can 'determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed.'" Rivas v. City of Passaic, 365 F.3d 181, 196 n.10 (3d Cir. 2004) (quoting Johnson, 515 U.S. at 319). And while our review here is somewhat "analogous to [the context of] a 12(b)(6) motion, where we would not evaluate the underlying evidence to support the plaintiff's claims," Atkinson v. Taylor, 316 F.3d 257, 261 n.4 (3d Cir. 2003), we still apply the standard for summary judgment, and will "construe the facts in the light most favorable to the plaintiffs." Rivas, 365 F.3d at 201 (Ambro, J., concurring in part).

## 2. The Walters' Appeal

The Walters appeal from the District Court's partial grant of summary judgment regarding qualified immunity, which by itself is not a "final decision" within the meaning of 28 U.S.C. § 1291. See, e.g., Coleman v. Parkman, 349 F.3d 534, 537 (8th Cir. 2003) ("the collateral order doctrine does not apply . . . when a party complains that the district court should not have granted summary judgment based on qualified immunity"). However, we have jurisdiction over the Walters' appeal as certified by the District Court and accepted by us under 28

18

U.S.C. § 1292(b). The scope of our review of the Walters' appeal is not limited directly by the Johnson line of cases. See Yamaha Motor Corp. v. Calhoun, 516 U.S. 199, 204 (1996) (in appeals certified under section 1292(b), "the courts of appeals [may] exercise jurisdiction over any question that is included within the order that contains the controlling question of law identified by the district court"). But because the Walters appeal from the grant of summary judgment against them, our standard of review is essentially the same as it is for the appeals of Mitchell, DeSarro and Jacobs–we will construe the facts in the light most favorable to the Walters, and will determine whether, on those facts, DeSarro and Jacobs are entitled to qualified immunity. See, e.g., Egolf v. Witmer, 526 F.3d 104, 106-107 (3d Cir. 2008) (appeal from grant of summary judgment based on qualified immunity) ("we will accept the facts as determined by the District Court, construing them in a light most favorable to the party that is claiming a constitutional violation").

## B. Qualified Immunity

We now turn to the applicability of qualified immunity, an issue raised in all three appeals. Qualified immunity, as the Supreme Court has explained, is the principle that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To determine

whether this type of immunity applies, we engage in a multi-step inquiry. "First, we must ask whether the conduct alleged by the plaintiff violated a clearly established principle of constitutional or statutory law. If so, then we go on to ask whether the unlawfulness of the action would have been apparent to an objectively reasonable official." Showers v. Spangler, 182 F.3d 165, 171-172 (3d Cir. 1999) (internal citation omitted); see also Rouse v. Plantier, 182 F.3d 192, 196-197 (3d Cir. 1999) (three-step inquiry) ("(1) whether the plaintiffs alleged a violation of their constitutional rights; (2) whether the right alleged to have been violated was clearly established in the existing law at the time of the violation; and (3) whether a reasonable official knew or should have known that the alleged action violated the plaintiffs' rights").

Whether this inquiry is couched in two or three stages, the first or "threshold question" is this: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [official's] conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001). Here, the Walters allege that Mitchell, DeSarro, and Jacobs deprived Michael Walter of his right to substantive due process under the Fourteenth Amendment to the Constitution. The District Court held that the facts, taken in the light most favorable to the Walters, support this claim under the theory of state-created danger. We disagree with the District Court, and on this basis we will hold that qualified immunity is applicable here as to all defendants and events at issue.

20

## 1. State-Created Danger

The state-created danger doctrine–developed by a number of Circuit Courts of Appeal but not yet formally recognized by the Supreme Court–is an exception to the rule that "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." Deshaney v. Winnebago County Dep't of Soc. Serv., 489 U.S. 189, 196 (1989). In other words, even where a plaintiff suffers harm at the hands of a non-governmental actor, the government may be liable because "the government has a constitutional duty to protect a person against injuries inflicted by a third-party when it affirmatively places the person in a position of danger the person would not otherwise have faced." Kamara v. AG of the United States, 420 F.3d 202, 216 (3d Cir. 2005). In our Circuit, there are four "essential elements of a meritorious 'state-created danger' claim:

> (1)    the harm ultimately caused was foreseeable and fairly direct;
>
> (2)    a state actor acted with a degree of culpability that shocks the conscience;
>
> (3)    a relationship between the state and the plaintiff existed such that the plaintiff was

a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

(4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all."

Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006), cert. denied, 127 S. Ct. 1483 (2007).

The District Court held that genuine issues of material fact exist as to each of these four elements, and that therefore the Walters meet the "threshold question" in the qualified immunity analysis. Walter, 465 F. Supp. 2d at 418-22, 427. We agree that the third element is met–as a participant in Stacy's arrest, Michael Walter was in a discrete class of persons more likely to be targeted by Stacy than was a member of the public in general. And we may assume without deciding that the first element, foreseeability of the harm, is met as well. But we conclude that the District Court erred in holding the second and fourth elements of the state-created danger test satisfied in this case. In particular, we hold that no reasonably jury could find that

Mitchell, DeSarro, and Jacobs acted with conscience-shocking culpability in planning and effecting Stacy's arrest and confession, and we hold that the failure to warn the Walters in 2002 about Stacy's behavior cannot be deemed an affirmative use of authority sufficient to predicate liability.

### a. Stacy's Arrest Does Not Shock the Conscience

As the District Court recognized, "[t]he exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case," Miller v. City of Phila., 174 F.3d 368, 375 (3d Cir. 1999), and depends in particular on "the extent to which a state actor is required to act under pressure." Sanford v. Stiles, 456 F.3d 298, 301 (3d Cir. 2006). "In a 'hyperpressurized environment,' an intent to cause harm is usually required," while "in cases where deliberation is possible and officials have the time to make 'unhurried judgments,' deliberate indifference is sufficient." Id. at 309. In the middle ground, or "circumstances involving something less urgent than a 'split-second' decision but more urgent than an 'unhurried judgment,'" there is a mid-level standard that requires gross negligence and arbitrariness–the state actor must "consciously disregard[] a great risk of serious harm." Id. at 308 (internal citation omitted).

Here, the District Court held that the mid-level culpability standard should apply to the circumstances of Stacy's arrest at the Walters' house in 2001, because "Mitchell

23

was forced on-the-spot to make a decision whether to allow [Stacy to talk to Walter] and potentially gain a confession (or alternatively be forced to break up a fist-fight), or disallow it and likely not gain a confession (and potentially hamper Stacy's prosecution)." Walter, 465 F. Supp. 2d at 420.[2]  We agree that the mid-level culpability standard is appropriate for Mitchell's actions at the Walters' house, and we hold that no reasonable jury could find it met.[3]  First and foremost, Mitchell asked

---

[2]Implicit in the District Court's holding is its determination that–contrary to the Walters' allegations in the Amended Complaint and their argument on appeal–Mitchell did not plan ahead of time to involve Walter in the process of extracting a confession from Stacy (and, by implication, neither did DeSarro or Jacobs).  To the extent the Walters' appeal gives us jurisdiction to review this factual determination by the District Court–because the Walters appeal from the grant of summary judgment–we affirm that the evidence does not support a finding that Mitchell, DeSarro, or Jacobs planned ahead of time to have Michael Walter personally extract a confession from Stacy. Mitchell testified that he did not so intend, and the Walters do not point to any testimony or other evidence contradicting him on this point.  See Mitchell Dep. at 120 ("Q: Did the plan involve Mr. Walter conducting any of the interrogation?  A: Never").

[3]We note that the District Court's opinion on this point is not clear.  After discussing the applicable standard of culpability for the day of Stacy's arrest, the District Court moved directly to the events of 2002, and held that a jury could find the defendants

Walter if he was willing to talk to Stacy, and only allowed the conversation once Walter agreed. Second, even assuming that Mitchell's decision involved a great risk to Walter's safety, the facts as articulated by the District Court do not show that Mitchell consciously disregarded that risk, but rather that he weighed it against the possible benefits that could result, including a stronger case against Stacy. Thus, while Mitchell's decision was clearly unfortunate, and may have been unreasonable under the circumstances, it was at most highly negligent.

We also hold that DeSarro and Jacobs did not act with the culpability required by the state-created danger doctrine in the timeframe of Stacy's arrest. Even assuming that both DeSarro and Jacobs approved the plan to have Michael Walter lure Stacy out to be arrested, and even assuming that this approval was the result of unhurried judgment, such that the lowest standard of conscience-shocking culpability applies, no reasonable jury could find that DeSarro and Jacobs acted with deliberate indifference to Michael Walter's safety. Rather, DeSarro and Jacobs had to balance the risks of arresting Stacy at the Walters' house against the risks of arresting him at his own house, where they believed (rightly, as it turned out) that Stacy had an arsenal of weapons at his disposal.

---

were deliberately indifferent to Michael Walter's safety in that later timeframe. See Walter, 465 F. Supp. 2d at 421.

In this regard our case is analogous to Matican v. City of New York, recently decided by the Second Circuit. 524 F.3d 151 (2d Cir. 2008). In Matican, the plaintiff participated in a sting to help police arrest a suspected drug dealer. Matican set up a drug buy with the dealer, and when the dealer arrived, Matican identified his car so that the police could search it and arrest him. Id. at 153-54. After being released on bail, the dealer found Matican on the street and slashed his face with a box cutter. Id. at 154. Matican sued the police, alleging that "the officers executed the sting operation in such a way that [the drug dealer] learned that Matican had set him up." Matican v. City of New York, 424 F. Supp. 2d 497, 505 (S.D.N.Y. 2006). In affirming that this police conduct did not shock the conscience, the Second Circuit observed that the officers designing the sting "had two serious competing obligations: Matican's safety and their own," and they could reasonably have concluded that "the arrest of a potentially violent drug dealer demanded" the protocol used even though it "might jeopardize the informant's identity in the future." Matican, 524 F.3d at 159.

In our case, as was the Second Circuit in Matican, we "are loath to dictate to the police how best to protect themselves and the public, especially when our ruling could be taken to require officers to use riskier methods than their professional judgment demands." Id. Given that DeSarro and Jacobs did not intend for Walter to interrogate Stacy, but only for Walter to invite him over to the Walters' house on a pretext, we hold that

26

their approval of the arrest plan was at most negligent, and does not shock the conscience.

b. <u>Failure to Warn The Walters Does Not Constitute Affirmative Use of Authority</u>

We also hold that Mitchell, DeSarro, and Jacobs are entitled to qualified immunity for their failure to warn the Walters in 2002 about Stacy's behavior toward Mitchell, because a state actor's failure to warn about the likelihood of a private act of violence–even a highly culpable failure to warn–cannot itself predicate liability. Rather, "under the fourth element of a state-created danger claim, 'liability . . . is predicated upon the states' <u>affirmative acts</u> which work to the plaintiffs' detriments in terms of exposure to danger,'" and we "have never found a state-created danger claim to be meritorious without an allegation and subsequent showing that state authority was affirmatively exercised." <u>Bright</u>, 443 F.3d at 282 (quoting <u>D.R. by L.R. v. Middle Bucks Area Vo. Tech. School</u>, 972 F.2d 1364, 1374 (3d Cir. 1992) (en banc) (emphasis added by <u>Bright</u> court)).

While "the line between action and inaction may not always be clear," <u>id.</u>, here the Walters' allegations about the period leading up to Stacy's July, 2002 trial undoubtedly fall on the side of inaction. The Walters allege in their Amended Complaint that after Stacy began exhibiting threatening behavior, Mitchell, DeSarro, and Jacobs made conscious

27

decisions not to re-arrest Stacy, not to seek revocation of his bail, and not to warn Michael Walter or arrange protection for him, and that those decisions shock the conscience.[4] We have squarely held that "failing to more expeditiously seek someone's detention," and failing to arrest someone who poses a threat, are not themselves affirmative uses of authority within the meaning of the state-created danger doctrine. Bright, 443 F.3d at 284; Burella v. City of Phila., 501 F.3d 134, 147 (3d Cir. 2007). We have also held that a state actor's assurance to a plaintiff that he had "nothing to worry about and that he [was] fine," when in fact the plaintiff was quite ill and required emergency care, did not amount to an affirmative use of state authority because it did not restrain the plaintiff from acting on his own behalf to obtain private assistance. Ye v. United States, 484 F.3d 634, 641 (3d Cir. 2007); id. at 642 ("assurances of well-being are not 'affirmative' acts within the meaning of the fourth element of a state-created danger claim"). If a state-created danger claim cannot be predicated on a failure to arrest, neither can it be predicated on a failure to provide protection. See, e.g., Bright, 443 F.3d at 284 ("mere 'failure to protect an individual against private violence' does not violate the Due Process Clause" (quoting Deshaney, 489 U.S. at 197)). And if an assurance of well-being despite the presence of a threat is not a sufficiently

---

[4]We note that the District Court found that Mitchell and DeSarro did in fact seek to have Stacy's bail revoked, without success, just before Stacy murdered Michael Walter. Walter, 465 F. Supp. 2d at 414.

28

affirmative act, neither is the mere failure to warn of a threat.

In holding that Mitchell, DeSarro, and Jacobs are entitled to qualified immunity for the events of 2002, we recognize that those events did not occur in a vacuum, and that the threat posed by Stacy in 2002 was likely due in part to the circumstances of his arrest in 2001, including the actions taken by the defendants at that time. But because those earlier actions were not taken with the required level of culpability, they cannot predicate a state-created danger claim. Indeed, our caselaw firmly supports the requirement that defendants act with culpability. Compare Phillips v. County of Allegheny, 515 F.3d 224, 241 (3d Cir. 2008) ("the complaint alleges that [defendants] were aware that Michalski was distraught over his break up with Ferderbar and yet they assisted him in getting confidential information on Ferderbar . . . .[thus] the complaint does sufficiently allege facts that these defendants . . . were deliberately indifferent in providing Michalski more confidential information" (emphases added)) and Rivas v. City of Passaic, 365 F.3d at 196 ("If [the defendants] misrepresented the assault, not only did they abdicate their duty to render medical assistance, but they placed Mr. Rivas in greater danger by falsely accusing him of acting violently," and "[a] jury could find . . . that such conduct shocks the conscience" (emphases added)) with Bennett v. Phila., 499 F.3d 281, 289 (3d Cir. Pa. 2007) ("Maiden did not perform the duties vis-a-vis Porchia that were incumbent upon a dedicated social worker. Although we believe Maiden's actions (or more accurately, inactions) were beyond the pale, we conclude that in

29

essence the [plaintiff's] argument is no more than another effort to circumvent the state-created danger doctrine. We are not free to do that." (emphasis added)) and Burella, 501 F.3d at 147-148 ("Jill Burella contends that the officers' 'continual refusal to enforce the court order and follow state law requiring Officer Burella's arrest, together with their false direction that "there was nothing they could do," as well as overall inadequate intervention were affirmative acts which together increased the likelihood of harm,'" but "it is apparent that what she actually contends is that the officers failed to act at all . . . ," and "[t]hat failure, while deeply troubling and unquestionably tragic, does not give rise to a cognizable state-created danger claim." (emphasis added)).

Here, the District Court held that a jury could reasonably find that the defendants affirmatively used their authority in 2001, by "allowing Michael Walter to become involved in eliciting a confession from Joseph Stacy," Walter, 465 F. Supp. 2d at 422, and could reasonably find that the defendants were deliberately indifferent in 2002 in their "failure to warn the Walter family of Joseph Stacy's menacing behavior . . . ." Id. at 421. But for the reasons we have articulated above, these findings would not amount to a constitutional violation–they would not establish that the defendants committed a culpable act, only that they acted in 2001 and then, months later, shocked the conscience through inaction. See, e.g., Kaucher, 455 F.3d at 435 (affirming grant of summary judgment for defendants because plaintiffs "have not alleged an affirmative, culpable act

30

on the part of defendants sufficient to implicate the state created danger doctrine" (emphasis added)); Bright, 443 F.3d at 284 (rejecting plaintiff's argument where plaintiff "seeks to bring the law enforcement delay within the scope of the state-created danger doctrine by pointing to an affirmative action of the state which preceded it"); Leidy v. Borough of Glenolden, 277 F. Supp. 2d 547, 560, 565 (E.D. Pa. 2003) (Even though "a jury could conclude that Police Chief Cooke's supine, bureaucratic inaction constituted conscience-shocking deliberate indifference," state-created danger claim was rejected because "the wrongs of which plaintiffs complain is that the State did not do enough to protect them . . . ." (emphasis added)), aff'd 117 Fed. Appx. 176 (3d Cir. 2004).

Because the Walters cannot establish a constitutional violation, we need not move beyond this threshold question in the qualified-immunity analysis. See Saucier, 533 U.S. at 201; Ye, 484 F.3d at 643 n.6 ("As there was no constitutional tort, we need not reach the question of whether the law was clearly established . . . ."). Further, because we hold that all three defendants are entitled to summary judgment on the basis of qualified immunity, we need not decide whether DeSarro and Jacobs are entitled to absolute immunity.

## III. Conclusion

For the foregoing reasons, we affirm the decision of the District Court that DeSarro and Jacobs are entitled to qualified

31

immunity for the events of 2002 preceding Michael Walter's murder. We reverse the decisions of the District Court that DeSarro and Jacobs are not entitled to qualified immunity for their role in the 2001 arrest of Joe Stacy, and that Mitchell is not entitled to qualified immunity for his role in the 2001 arrest or for the events of 2002. We hold that Mitchell, DeSarro, and Jacobs are entitled to qualified immunity for all events at issue in these appeals, and we remand to the District Court with instructions to grant judgment against the Walters' substantive due process claim on this basis, as well as for any other further proceedings necessary and consistent with this opinion (which, we recognize, might consist only of entering final judgment).